Emmitt VALENTINE, Clifford Roberts, Darryl V. Conquest, Charles Holman, James Drayton, Allen Rodziewicz, David Fletcher, Najee Shabazz, James Williams, David Godwin, Darnell Richardson, Otis Terrell, Kenneth Watson, Ali–Muslim Muhammad, Kerwin Colon, Masia Mugmuk, Arnold Tucker, Robert Davis, Askin Muhammad, Lawrence White, Johnny Bankston, Barry Robinson, Jonathan Cook, Michael Barron, Omar Shabazz, Aaron Stamps, Melvin Stamps, Kent Cooper, Lewis Webb, James Webb, Ruben Medal, Michael Graves, Jeff Jacobitti, Robert L. West, Gregory Murchinson, L. Royal Fisher, Earl Bayard, Dawud S. Amin, Raheem Akbar, Abdul Latif, Abdus–Sami A. Akbar, Abdul Qadir, Ali Nasir, Barry Dunn, Leroy Johnson, Joe Kuklinsky, Gerald Gary, Henry Oliveria, Frank Hubbard, Chris Anderson, Anthony Lattimore, Milton J. Conklin, Jr., Frank Miller, Richard Williams, Henry McCree, Edward L. Brown, Gary Reeves, Clifford Robertson, Anthony Frederick, Lawrence Peterson, Stanley Farms, Charlie Farms, Darren Hawkins, Michael Rose, Charlton Franklin, Darvin Elder, James Carter, Nicola Chalet, Roscoe Miller, Thomas A. Patterson, Louis Zeltner, Walter Simon, Derek Bethea, William Marshall, Michael L. Madison, Barry Williamson, Samuel G. Bibby, Eugene Poole, Raymond Torres, Isiah Collins, Claude Tigney, David Mitchell, Walter Saxton, Terrance Hayes, Arnold Farmer, Keith Heard, Abdallah Khaliq & Victor Parker, Herbert Lee Smith, Louis P. Wright, James F. Fornino

v.

Howard L. BEYER, Individually and as Superintendent of Trenton State Prison; Elaine W. Ballai, Individually and as Special Assistant for Legal Affairs for the Department of Corrections; Anthony C. Turner, Individually and as Assistant Superintendent of Trenton State Prison; Willis Morton, Individually and as Assistant Superintendent of Trenton State Prison; James Barbo, Individually and as Assistant Superintendent of Trenton State Prison; Ed O'Doherty, Individually and as Legal Services Coordinator for the Department of Corrections; Vernon Johnson, Individually and as Policy Development at Trenton State Prison; Dorothy Washington, Individually and as Director of Professional Services at Trenton State Prison; Brigite Mitchell, Individually and as Executive Assistant at Trenton State Prison; Tom Johnson, Individually and as Director of Social Workers at Trenton State Prison; Charles Trautman, Individually and as Chief Deputy Keeper of Trenton State Prison; Douglass K. Heil, Individually and as Director of Education at Trenton State Prison; Ron V. Paice, Individually and as Assistant Supervisor of Education at Trenton State Prison; Patricia Singleton, Individually and as Librarian at Trenton State Prison; Gary Sheppard, Individually and as Disciplinary Hearing Officer for Department of Corrections; Robert Makarski, Individually and as Disciplinary Hearing Officer for Department of Corrections; Woodward (First name unknown), Individually and as Disciplinary Hearing Officer for Department of Corrections; Fred Zimmer, Individually and as a Guard Captain at Trenton State Prison; R. Rea, Individually and as a Guard Captain at Trenton State Prison; Anthony Kubala, Individually and as a Guard at Trenton State Prison; Parham (First name unknown), Individually and as a Guard at Trenton State Prison; Barney Dyrnes, Individually and as a Guard at Trenton State Prison; Holvey (First name unknown), Individually and as a Guard at Trenton State Prison; Harris (First name unknown), Individually and as a Guard at Trenton State Prison; Averhart (First name unknown), Individually and as a Guard at Trenton State Prison; Williams (First name unknown), Individually and as a Guard at Trenton State Prison; Inman (First name unknown), Individually and as a Guard at Trenton State Prison; their agents and successors in office, Appellants.

No. 87–5606.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
March 4, 1988.

Decided June 20, 1988.

Michael E. Kahn, Dept. of Law and Public Safety, Div. of Law, Trenton, N.J., for appellants.

Emmitt Valentine, Trenton State Prison, Trenton, N.J., pro se.

Victor Parker, Trenton State Prison, Trenton, N.J., pro se.

Abdallah Khaliq, Trenton State Prison, Trenton, N.J., pro se.

James F. Fornino, Trenton State Prison, Trenton, N.J., pro se.

Louis P. Wright, Trenton State Prison, Trenton, N.J., pro se.

Herbert Lee Smith, Trenton State Prison, Trenton, N.J., pro se.

Allen Rodziewicz, Trenton State Prison, Trenton, N.J., pro se.

Clifford D. Roberts, Trenton State Prison, Trenton, N.J., pro se.

Ronald E. Long, Sr., Trenton State Prison, Trenton, N.J., pro se.

Before MANSMANN, HUTCHINSON, and HUNTER, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

Inmates at Trenton State Prison, New Jersey's highest security state prison, filed a 42 U.S.C. § 1983 civil rights action against prison officials, challenging the adequacy of the prison's legal assistance program. While the action was pending, the prison administration attempted to implement proposed changes to the existing legal assistance plan. Claiming that these changes would interfere with the constitutionally guaranteed right of access to the courts, a class of prisoners sought to enjoin the administration from implementing these changes to the program. On August 7, 1987, the district court issued findings of fact and conclusions of law upon which a preliminary injunction was issued.

We affirm the grant of a motion for preliminary injunction unless the district court "abused its discretion, committed an error of law or made a clear mistake on the

facts." *Colt Industries, Inc. v. Fidelco Pump and Compressor Corp.*, 844 F.2d 117, 119 (3d Cir.1988). We find that the district court did not err in deciding that the inmates showed that the new plan did not provide a reasonable alternative to the old plan's provision for access to the courts. Therefore, a likelihood of success on the merits of their constitutional challenge to the plan was sufficiently demonstrated. The district court's accompanying conclusion that, as a result of the inadequate access to the courts, the inmates suffered and will continue to suffer irreparable harm was also without error. Finally, we conclude that the district court's determination that no greater harm to the penological interests of the prison administration by issuance of the injunction had been demonstrated was not erroneous. Accordingly, we will affirm the district court's award of preliminary injunctive relief on behalf of the prisoners.

## I.

Trenton State Prison's legal access program has a prior history of judicial scrutiny. In *Johnson v. Hilton*, Civil No. 77–59 (D.N.J. Sept. 12, 1978), the institution's inmates had complained that access to legal materials and notary services was constitutionally deficient. The district court agreed and held that the lack of a formal training program for inmate paralegals and the inaccessibility of law books to those housed in closed custody rendered the legal access aspect of the inmates' incarceration constitutionally inadequate. Although, as here, the inmates in *Johnson* requested an injunction, the district court chose instead to order the prison administration to implement a constitutional legal access plan, suggesting ways in which an acceptable plan could be formulated.

The prison complied with this mandate— the plan was then reviewed and found to pass constitutional muster. *Johnson v. Hilton*, Civil No. 77–59 (D.N.J. Feb. 19, 1980). A central feature of the approved plan involved the use of inmates as paralegals. To become a paralegal one must be formally assigned as such by the prison classification committee. Inmates are selected for a paralegal job utilizing certain criteria: high school graduation or its equivalent, ability to absorb and understand legal material and demonstration of some typing skills. The candidate must also satisfactorily complete a training course.

There are two groups of paralegals at the prison. One group is centralized in and operated by the law library. The law library paralegals perform essentially as assistant law librarians. Their basic functions are to guide inmates in their research, help them locate books and assist in shepardizing cases.

The other group of paralegals are members of the Inmate Legal Association ("ILA"), an incorporated inmate affinity group. The ILA has established an organizational network of inmates who perform legal tasks such as interviewing inmates, researching the law and preparing legal papers. The ILA also includes members who are not prison-classified paralegals. One can become a member of the ILA by a vote of its membership; but only those ILA members cloaked with prison classification paralegal status are permitted to function officially as such. The membership has been provided office space and has acquired corporate assets including lawbooks, desks, file cabinets, and typewriters. The ILA meets weekly at which time legal work is assigned and its continuing legal education program is conducted.

An essential role performed by the inmate paralegals is servicing the legal needs of those incarcerated in closed custody units. Inmates so confined are not permitted to visit the law library. Accordingly, the system requires one in closed custody requesting legal assistance to submit a written request for legal services to a housing officer. The housing officer gives the form to an area sergeant who in turn gives it to traffic control. Traffic control then transmits the form to the library, where it is given either to a law library paralegal or to an ILA paralegal, depending upon the request. Only prison-classified paralegals

are permitted to visit the closed custody units.

In order to visit the inmate requesting assistance, the paralegal must first get clearance from custody personnel. If a paralegal receives clearance, he then proceeds to traffic control where further progress to the closed custody unit requires availability of a badge.[1] In addition to the paralegals, other inmates use these badges to gain access for other purposes. If all badges are in use, the paralegal cannot gain access to the unit. The paralegal is also denied access if there are other activities in progress in the unit.

The gravamen of the inmates' § 1983 action is that the increase in the inmate population, particularly in the closed custody units, rendered the then-in-place legal access plan constitutionally inadequate. In 1978, when the original plan was formulated, there were approximately 900 inmates; at the time of the hearing, there were over 2,000, more than 800 of which were housed in closed custody units.

The prison administration reevaluated its legal services program in mid–1986, in part precipitated by the filing of this lawsuit. Citing the absence of ILA accountability to the administration, the prison officials proposed to eliminate the inmate organization as a method of improving the legal access system. It had been determined by prison administration personnel that the ILA actually interfered with the prison's ability to manage the legal access program. The new plan thus anticipated the consolidation of the ILA paralegal staff with the law library paralegals, with the result that the ILA would be disbanded.

A series of events, including complaints regarding the conduct of ILA services, reduction in the custodial staff, security concerns regarding ILA meetings and vacancies created in the paralegal program due to disciplinary infractions, caused the present administration to accelerate implementation of the proposed changes.[2] Accordingly, the administration proposed to phase out the ILA and, in its stead, all paralegals were to be supervised by the prison's Department of Education. The "lawyering services" formerly provided by the ILA would be performed by the consolidated paralegal force.

Four motions were filed on behalf of the inmates seeking preliminary relief from the prison administration's policy changes. Specifically, the inmates requested the court: (1) to prohibit the administration from reducing the evening hours during which the paralegals could visit the closed custody units;[3] (2) to permit the ILA to continue to hold its weekly meetings; (3) to prohibit the administration from reducing the number of ILA paralegals; and (4) to prevent the institution from disbanding the ILA and consolidating it with the law library paralegals.[4]

The district court, on March 18, 1987, held a status conference and requested settlement proposals from the parties. The prison administration submitted a plan for legal access, which included the abolishment of the ILA. In response, the inmates filed an additional motion for preliminary injunctive relief to prevent the prison from implementing this plan.[5]

1. At the time of the hearing, for the 13 various closed custody units housing approximately 592 inmates, there were 8 badges available for visitation to the units.

2. A portion of the proposed alteration to the legal assistance plan went into effect in December 1986 when evening visitation hours to the closed custody units were eliminated.

3. While paying deference to the security concerns of the prison officials, the district court nonetheless ordered the administration to present within 60 days a solution to alleviate the problems associated with elimination of the evening hours.

4. The ILA also requested relief to reduce certain security constraints, i.e., that strip searches conducted when paralegals entered and left closed custody units be discontinued. The district court decided against the ILA on this issue and it is not now before us.

5. The inmates also sought a temporary restraining order seeking identical relief. Because the prison administration represented that they would not disband the ILA while the motion was pending, the request was denied.

On June 18 and 19, 1987, the district court conducted evidentiary hearings at the prison after which it issued findings of fact and conclusions of law. The court noted three deficiencies in the prison administration's proposed plan: (1) no provision for increasing the lawyering skills of the law library paralegals; (2) non-utilization of the non-paralegal members of the ILA; and (3) failure to make disposition of the corporate assets of the ILA.

Significantly, the court then found that the changes brought about by the alteration of the legal access plan had caused and would continue to cause irreparable harm to be suffered by the inmates. Thus the court ordered that the disbanding of the ILA and the suspending of the weekly meetings be preliminarily enjoined. The court also compelled the administration to submit to the ILA within thirty days a list of inmates considered appropriate for positions as ILA paralegals. The ILA would then be permitted to select from that list inmates it desired to have within its membership; the number selected would restore the ILA to its strength as of December 1986.

The administration filed this appeal over which we have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## II.

A party seeking a preliminary injunction has the burden of demonstrating (1) a reasonable likelihood of success on the merits; (2) irreparable harm caused by denial of the requested relief; and (3) that issuance of the injunction will not result in a greater harm to the non-moving party.[6] *ECRI v. McGraw Hill, Inc.,* 809 F.2d 223 (3d Cir. 1987).

We first address the likelihood of success on the merits of the inmates' claim.

The inmates argue that the administration's proposed legal access procedure is so limiting that it effectuates a denial of meaningful legal access to the courts contrary to the constitutional guarantees expressed in *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Although a specific method of access is not mandated, prison practices or regulations are invalid if they can be construed as imposing barriers to such access. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed. 2d 718 (1969).

In *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498, the Supreme Court held that adequate assistance from persons trained in the law must be made available to prisoners who do not have access to the law library. Our court has decided that the alternate means of providing legal assistance for those who do not have library privileges (in this instance, those housed in closed custody units) must be of at least equal caliber. *Bryan v. Werner,* 516 F.2d 233 (3d Cir.1975).

The inmates strongly urge that disbanding the ILA and denying them the opportunity to meet and substituting instead a consolidated law library force deny them a reasonable alternative to meaningful access to the courts. The primary deficit, in the inmates' view, was the lack of any provision for additional legal training of the law library paralegal staff. In support they refer to the district court's finding concerning the high quality of the legal work performed by the ILA versus the less substantial "messenger service" currently provided by the law library paralegals. The inmates also point to testimony of the law library paralegals who conceded that they were not trained to prepare writs, lawsuits or other litigation matters.

The inmates further contend that the ILA's weekly meetings are crucial to effective legal networking as they provide the forum for distribution of legal work and continuing legal education for both its paralegal and non-paralegal members. The inmates also highlight the degree of privacy afforded by the ILA offices, and the

---

**6.** A fourth factor, which takes into account public interest considerations, was not addressed by the parties. Since there was no challenge to the public interest by the prison based on this factor, we have no need to discuss it.

ILA's access to a telephone which can be utilized to contact local legal and community services. The inmates thus argue that the legal services performed by the ILA provide the inmates with the only meaningful access to the courts.

The administration asserts that the merger of all the paralegals under the direction and supervision of the law library would facilitate overseeing the delivery of legal services and enable the prison to insure that its federal constitutional obligation was met. The administration further argues that consolidation of the two groups would enhance the quality of the prison's legal access plan in that the ILA paralegals would continue to give legal assistance, and the law library paralegals' responsibilities would be expanded to permit them to provide the same research and advisory function as the ILA paralegals.[7]

With respect to the distribution of work, the administration's plan delegates this task to the prison's Education Department staff. The plan provides that the legal work would be allocated to the paralegal most experienced in any particular subject matter.

The district court determined that the prison administration's plan to eliminate the ILA was "hastily contrived, poorly thought out and could only be expected to seriously degrade the quality of the legal service provided to closed custody inmates." The court expressed concern that although the plan called for increased responsibility for the law library paralegals, it made no provision for enhanced training. The court also commented unfavorably on the non-utilization of the unclassified ILA members and the lack of provision for disposition of the assets of the ILA.

As pointed out in the inmates' arguments, the court found that the legal assistance of the ILA was generally of a much higher caliber than that of the law library paralegals and commended the quality of the work product of the ILA. The court then determined that the ILA's research and preparation skills provided a "tremendous service to those inmates not permitted to visit the law library and an invaluable service to an illiterate or non-English speaking inmate."

Based upon these factual findings, the district court reached the legal conclusion that the continued existence of the ILA was crucial to the continued viability of the prison's legal access program and that the proposed plan of the administration did not offer an equivalent system. The plan was thus deemed an unconstitutional impairment to the inmates' right of meaningful access to the courts.

■ The central inquiry in determining if the proposed legal access program withstands constitutional scrutiny is whether adequate assistance from persons trained in the law is made available to prisoners who do not have access to the law library. *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. An untrained legal research staff is insufficient to safeguard an inmate's right of access to the courts. *Para-Professional Law Clinic v. Kane*, 656 F.Supp. 1099 (E.D.Pa.), *aff'd*, 835 F.2d 285 (3d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1302, 99 L.Ed.2d 511 (1988).

■ We find the district court's findings of fact regarding the inadequacy of the replacement plan to be supported by the record. It is virtually undisputed that significant disparity exists in the quality of legal assistance between the two groups of paralegals. Yet, in attempting to abolish the ILA and in foreclosing the opportunity to enhance the legal skills of the members which was afforded by the meetings, the administration would terminate the legal training program which to date has effectively served the prison population.

---

**7.** In a footnote in its brief, the administration argued that the portion of the district court's order compelling it to fill the vacant ILA positions, subject to ILA approval, undermined its institutional authority. Since the district court's factual premise that the prison administration's plan did not currently provide the prisoners with the minimum access to legal materials and services the Constitution requires is not clearly erroneous, we disagree and find instead that the district court's order in this regard struck a balance consistent with the current situation in the prison.

Of particular concern are the needs of those in closed custody and illiterate and non-English speaking inmates who are totally dependent upon paralegal assistance in their legal endeavors. Without the training currently provided by the ILA, these inmates will be compelled to accept less competent assistance, which the district court found was, in effect, no assistance at all.

In response to the administration's argument that the ILA paralegals would continue to function as before, we do not view this "saving provision" as persuasive. The disrupting of the general structure of the ILA and the discontinuing of its meetings work a shut-down of the system which has operated effectively to service the legal needs of the prison community. The administration has not shown that the consolidated paralegal force would be privy to a similar legal networking system; therefore, the mere combination of the two groups of paralegals, without provision for continued training, is not a guarantee that the caliber of the legal assistance will remain intact.

Of lesser impact, but still worthy of consideration, is the measure of privacy afforded by the ILA office which will become unavailable once consolidation occurs. One can also assume, although not addressed by the administration's new plan, that the ILA assets will be incorporated into the current law library causing that facility to become more crowded and less private.

Given the current standard of meaningful access to the courts, the legal conclusion that the replacement program would not provide a reasonable alternative for legal access was not in error. Therefore, the district court did not err in finding that the inmates were likely to succeed on the merits of their claim.

### III.

The district court's conclusion that the proposed plan did not meet constitutional standards was accompanied by a legal determination that its implementation would cause irreparable harm. The court cited the testimony offered by the inmates that the inadequate legal access plan had already caused such harm—the damage evidenced by the inmates' inability to comply with court filing deadlines.

The prison administration contended in the district court that there was no evidence linking the inability to file claims and the proposed plan. The administration then argued that even if there were some indication of harm, its presence was speculative and not of the imminent character required for issuance of a preliminary injunction. It therefore urges us to decide that the district court's finding was erroneous.

This we decline to do. The relevant question is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is issued. *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244 (3d Cir.1985). Here the inmates have made ample showing that the legal program did not provide sufficient access to the courts. Clearly no greater harm than the inability to meet filing deadlines, potentially precluding litigation forever, is possible when the question of access to the courts is at issue. That such events did occur is supported by the record, and to conclude that further similar damage would be caused by the proposed plan is not unwarranted. We concur with the district court that the requirement of irreparable harm has been satisfied.

### IV.

We next consider the question of greater harm to the non-moving party. The prison administration contends that the court's decision to enjoin abolishment of the ILA failed to pay sufficient deference to official policy considerations, particularly security concerns, of the prison administration. The administration asserted that its plan met the legal test of providing the least restrictive alternative without compromising a legitimate institutional objective. *Turner v. Safley*, —— U.S. ——, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). It then argues that the court improperly substituted its own judgment on concerns of institutional

**958**

administration, rather than exercising appropriate judicial restraint concerning these sensitive matters.

The administration concluded that in failing to acknowledge the potential security threat presented by the continued functioning of the ILA, the district court erroneously balanced the threat of harm in favor of the inmates.

We find, to the contrary, that the district court carefully analyzed security considerations and weighed them carefully in its determination. The court paid due deference to the policy considerations recently mandated by the Supreme Court in *O'Lone v. Shabazz,* — U.S. —, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (reaffirming importance of penological security considerations in evaluating prison regulations). This is evidenced by the district court's unwillingness to render a decision concerning reinstatement of the evening hours for visitation in closed custody units without input from the prison administration and in its determination that strip searches should remain intact. What the trial court refused to do was to assume a security problem with the ILA meetings absent any evidence that they did indeed pose such a risk. Certainly stringent security measures are necessary to maintain a working and enforceable penal system. Also of paramount importance, however, must be the fact that the Supreme Court has emphatically reaffirmed the constitutional right of prisoners of meaningful access to the courts. *Bounds,* 430 U.S. at 818, 97 S.Ct. at 1493. We find that the district court, when weighing all factors and according the requisite amount of deference to the institution's security concerns, did not err in concluding that the far greater harm will accrue to the inmates who will be deprived of the highest quality legal assistance available.

We caution that the district court did not grant the ILA unlimited tenure and unbounded authority, but rather found that the alternative offered by the administration was inadequate to serve the inmates' needs. For this reason the injunction was properly issued and we will affirm the order of the district court.