4 F.3d 195
 Debro S. ABDUL-AKBAR, Appellant in No. 92-7571,
v.
Robert J. WATSON; Walter W. Redman; Hank Risley; Donald
Davis; Bruce Hobler; DE Dept. of Corrections,
Robert J. Watson, Walter W. Redman, Bruce Hobler and Henry
Risley, Appellants in No. 92-7572.
 Nos. 92-7571, 92-7572.
 United States Court of Appeals,
Third Circuit.
 Argued June 17, 1993.
Decided Aug. 11, 1993.
 
 Brian J. Bartley (argued), Wilmington, DE, for cross-appellant in No. 92-7571 and appellee in No. 92-7572.
 Stuart B. Drowos (argued), Deputy Atty. Gen., Dept. of Justice, Wilmington, DE, for cross-appellees in No. 92-7571 and appellants in No. 92-7572 Robert J. Watson, Walter W. Redman, Hank Risley and Bruce Hobler.
 Before: SCIRICA, COWEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 Plaintiff Debro Siddiq Abdul-Akbar ("Abdul-Akbar"), charging that the library and the legal resource facilities at the Maximum Security Unit ("MSU") where he was incarcerated were constitutionally inadequate to afford him a right of access to the courts, brought a section 1983 action in his own name only against several officials of the Delaware Department of Corrections. He sought only monetary damages. The district court ruled in favor of Abdul-Akbar and imposed compensatory and punitive damages against the officials. It also affirmatively ordered the officials to devise a new Legal Access Plan for the MSU at the Delaware Correctional Center ("DCC").
 
 
 2
 On appeal, both parties have focused on the question of whether the officials were entitled to qualified immunity and, therefore, were shielded from liability for damages in the first instance. Because we hold that the officials were, indeed, entitled to qualified immunity, we will vacate the district court's order awarding both compensatory and punitive damages.
 
 
 3
 Moreover, our independent review of the record discloses that Abdul-Akbar had been released from the MSU more than five months prior to the commencement of trial and more than eight months prior to the entry of the district court's order, which, as stated, had directed the officials to devise and implement a new Legal Access Plan for the MSU. Because that injunctive order could provide no relief to Abdul-Akbar, who was no longer confined in the MSU, we conclude that the district court issued its injunction in the absence of a live case or controversy amenable to such an injunctive remedy. We must, therefore, vacate that part of the district court's order that had directed the officials to formulate a new Legal Access Plan.
 
 I.
 
 4
 In January, 1989, Abdul-Akbar filed a pro se complaint pursuant to 42 U.S.C. Sec. 1983 in the United States District Court for the District of Delaware, alleging that the legal resources provided to inmates of the MSU at the DCC were constitutionally inadequate under Bounds v. Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). Abdul-Akbar had been confined to the MSU for a period of three-and-a-half years, commencing on July 1, 1987.[1] On February 1, 1991, Abdul-Akbar was released from the MSU. The MSU houses inmates who present particularly dangerous behavioral problems--violent prisoners who have great difficulty conforming to prison rules and regulations, who have assaulted the staff, or who pose an extreme danger to the outside community and, therefore, require the stringent security afforded by Maximum Security confinement. (A. 458). To that end, the DCC's Maximum Security Unit is comprised of a discrete facility, located outside the fence surrounding the other DCC buildings, and within which special rules and regulations provide for control over inmates' conduct and ensure the safety of the prison staff.
 
 
 5
 Abdul-Akbar's complaint named defendants Robert J. Watson, Commissioner of the Delaware Department of Corrections; Hank Risley, Bureau Chief of the Bureau of Prisons; Walter A. Redman, Warden of the DCC; and Bruce Hobler, Education Director for the Delaware Department of Corrections.[2] On October 19, 1990, while Abdul-Akbar was still incarcerated in the MSU, then Magistrate Judge (now District Court Judge) Sue L. Robinson, after having analyzed the constitutional requirements of Bounds v. Smith, supra, its Third Circuit progeny, and the library and legal resources available at the MSU, recommended that the defendants' motion for summary judgment be granted.[3] Despite the magistrate judge's analysis and recommendation, the district court denied the officials' motion for summary judgment on April 15, 1991 and ordered the case to proceed to trial.
 
 
 6
 In June 1991, about four months after his release from the MSU, Abdul-Akbar obtained the pro bono services of an attorney who has continued to represent him on this appeal. The three-day trial commenced on July 16, 1991, five-and-a-half months after Abdul-Akbar's release from the MSU, and concluded with orders entered in favor of Abdul-Akbar on October 7, 1991 and September 16, 1992.
 
 II.
 The District Court's Findings of Fact
 A.
 Functions of the Officials
 
 7
 The district court found at the conclusion of the trial that, during Abdul-Akbar's imprisonment at the MSU, Commissioner Watson's duty was to oversee all aspects of the operations of the Delaware Department of Corrections; Bureau Chief Risley's duty was to oversee all aspects of prison operations; Redman served as Warden of the DCC; and Hobler served as Education Director for the Department of Corrections, supervising law libraries, as well as legal and paralegal assistance to inmates.
 
 B.
 
 8
 Legal Resources and Services Provided to MSU Inmates
 
 
 9
 MSU inmates were not permitted physical access to the DCC's main law library, but instead were provided with three types of legal resources and services: (1) a satellite law library; (2) a "paging system" through which photocopies of materials available at the DCC's main law library--such as cases, motions, briefs, etc.--could be obtained free of charge; and (3) varying degrees of legal assistance provided by paralegals and an attorney.
 
 
 10
 (1)
 
 The MSU Satellite Library
 
 11
 Based on personal observation of the satellite library, the district court described it as a small oblong room with one wall of chain link fencing, a single desk, three small bookcases with two shelves each,[4] and a rack for legal forms. At the time of the trial, the MSU drainage system was such that the library occasionally flooded to a depth of eighteen inches, precluding the storage of books below that level. The library space also was used on occasion as a barber shop for inmates' haircuts.
 
 
 12
 The original satellite library inventory was prescribed in a consent decree entered in the United States District Court for the District of Delaware in Hearn v. Redman, C.A. No. 83-794 (D.Del.1985). That decree required that all of the treatises, forms and rules specified in the consent order be made available to MSU inmates as supplements to the then-existing library. It also provided that replacement to these volumes was to be made at the option of the Department of Corrections subject to availability of funds. The terms and conditions of access were specified in the consent decree, as was the employment of a librarian and a part-time paralegal (subject to adequate funding). On December 31, 1985, the consent decree was approved and entered by U.S. District Court Chief Judge Schwartz.[5]
 
 
 13
 In compliance with the terms of the Hearn v. Redman consent decree, the MSU satellite library was open daily from 9:00 a.m. to 11:00 a.m. and from 1:00 p.m. to 3:00 p.m. Although the Hearn decree provided that "[o]ne inmate at a time shall be permitted access to the [MSU] law library on a first-come, first-serve basis, for a period of thirty minutes," (A. 557), DCC official policy permitted inmates to visit the MSU for one hour per day. The consent decree provided further that restrictions on the number of inmates permitted in the MSU library, as well as the duration of each visit, was "subject to the building staff lieutenant's determination that access will not cause substantial interference with building security." (A. 557). Although the district court found that for "some period of time between July, 1987 and late 1989, inmates were not permitted to visit the MSU law library at all," Abdul-Akbar, 775 F.Supp. at 740, the district court made no findings specifying the dates on which that period either commenced or ended.[6]
 
 
 14
 (2)
 
 The MSU Paging System
 
 15
 The district court found that, due to limited resources,[7] an inmate was permitted five photocopied cases per week through the MSU paging system.[8] Official policy provided an exemption from that limitation where an inmate demonstrated an imminent court filing deadline. In order to obtain photocopied cases, citations were required. While generalized requests for materials, such as statutes by popular name (i.e. "Institutionalized Persons Act," "Administrative Procedures Act"), were denied, inmates were permitted to request cases from several subject matter files (i.e., rape) without citation.
 
 
 16
 (3)
 
 Legal Assistance Provided to MSU Inmates
 
 17
 The district court found that, during the period of Abdul-Akbar's incarceration in the MSU, the DCC employed two staff paralegals in addition to Francene M. Kobus, Inmate Legal Services Administrator for the Delaware Department of Corrections, whom the district court found to be "a credible witness, and a diligent and professional worker." Abdul-Akbar, 775 F.Supp. at 739. The district court found that all three paralegals had been certified, but that they lacked legal work experience in criminal and civil rights law.[9] The DCC also provided the services of several inmate librarians. Except for a period extending from July 24, 1989 to October 12, 1989, when a paralegal was assigned to work with MSU inmates twenty hours per week, appointments with paralegals were made upon written request and were scheduled within the six hours per week during which paralegal assistance was available to MSU inmates. This policy was in compliance with the terms of the Hearn v. Redman consent decree.
 
 
 18
 The district court found that staff paralegals attempted to assist inmates with their questions, occasionally consulting with Ms. Kobus, and that inmate paralegals often were assigned to respond to MSU inmates' requests. According to Ms. Kobus, inmates' expectations of the services that paralegals legitimately could perform were "overly high." Nevertheless, the district court found that "the work conducted by these paralegals [was] neither thorough nor particularly accurate." Id. at 742.
 
 
 19
 The district court noted that there was no evidence that the paralegals, though certified, received "on-the-job training" or "continuing legal education," id. at 742, and expressed dissatisfaction with the quality of assistance provided in a few specific instances. The district court was particularly critical of a state Deputy Attorney General, who had advised the paralegals to limit their assistance to instruction in legal research methods, in order to avoid engaging in the unauthorized practice of law. The district court further criticized the paralegals for failing to provide more aggressive legal advice following the retention of a part-time supervising attorney at the DCC in June 1989,[10] and rebuked the part-time attorney for failing to provide direct legal assistance to MSU inmates.
 
 
 20
 The district court found that Abdul-Akbar utilized all of the legal resources available to MSU inmates, having visited the MSU satellite library on many occasions and frequently having requested paralegal assistance. Moreover, Abdul-Akbar during his confinement at the MSU had received 74,553 photocopies through the MSU paging system, which represented one-third of all photocopying for DCC inmates during that period. Although the district court observed that "the vast majority of these copies were of pleadings for plaintiff's various lawsuits, and not of published cases or statutes," id. at 744, the court did not specify the portion of the 74,553 copies that was, indeed, comprised of requested legal research materials. Abdul-Akbar's "various lawsuits" included 125 actions filed in the United States District Court for the District of Delaware, 114 of which were pending at the time of trial in this case. Id. at 745.
 
 C.
 Security Considerations
 
 21
 The DCC Security Superintendent, Major Barry Hawlk, testified as to the security concerns that required, among other things, that the MSU be housed in a separate building, removed from all other DCC facilities, so as to enable better monitoring and control of MSU inmates. He also testified that MSU inmates were transported to the main building only when they required medical attention. Most significantly, however, Major Hawlk testified that an extraordinary number of correctional staff would be required to transport MSU inmates to the DCC's main law library, in order to prevent violent incidents and the flow of contraband, including weapons, into the MSU.
 
 
 22
 While even the district court characterized these security concerns as legitimate, that court nevertheless found that such security considerations did not preclude the possibility of transporting MSU inmates to the main law library. The district court found further that there was no evidence that Abdul-Akbar, himself, presented any special security risks, and that the security interests addressed by Major Hawlk related to the MSU inmate population in general.
 
 
 23
 Although Major Hawlk testified that only one security officer at a time was available to monitor the MSU law library, and that it was necessary to maintain the numerical superiority of corrections officers over inmates at all times, the district court made no explicit findings concerning security, security strategy, security concerns, or security staffing at the MSU.
 
 II.
 The District Court's Orders
 
 24
 Based on the findings described above, the district court concluded that each of the three components of the MSU legal resources package was, individually, constitutionally inadequate under Bounds v. Smith and the law of this circuit. Abdul-Akbar, 775 F.Supp. at 747-51 (citing, inter alia, Peterkin v. Jeffes, 855 F.2d 1021 (3d Cir.1988)); Valentine v. Beyer, 850 F.2d 951, 955 (3d Cir.1988). Moreover, acknowledging that "[p]rograms must be evaluated as a whole to determine their compliance with constitutional standards," id. at 747 (citing Bounds, 430 U.S. at 831-32, 97 S.Ct. at 1500). The district court held that the combination of services available to MSU inmates failed to satisfy the minimum requirements of Bounds. Id. at 751-52.
 
 
 25
 Having rejected the officials' claim to qualified immunity, the district court on October 7, 1991 entered judgment in favor of Abdul-Akbar and against Watson, Redman, Risley and Hobler. (A. 17.1). The district court awarded Abdul-Akbar $750 in compensatory damages and $750 in punitive damages,[11] and enjoined the officials to "devise [by January 7, 1992] a new plan for providing access to an adequate law library and/or adequate legal assistance to the inmates in the [MSU] at the [DCC]." Id.[12]
 
 
 26
 On January 7, 1992, the prison officials submitted their Legal Access Plan to the district court for approval, pursuant to the court's October 7, 1991 order. (See A. 17). The Plan, among other provisions, expanded the MSU library's holdings, and modified the library visiting hours, the paging system and the degree of legal assistance to be afforded to the MSU inmates. After reviewing the Plan--and having received no opposition to its terms from Abdul-Akbar, who by reason of his release from the MSU in February 1991 was no longer a member of the MSU inmate population--the district court approved it by order dated September 16, 1992.
 
 III.
 
 27
 Both parties on this appeal have focused their attention on the question of whether Abdul-Akbar was entitled to damages in light of the officials' claim to qualified immunity.[13] See Harlow v. Fitzgerald, 457 U.S. 800, 813, 102 S.Ct. 2727, 2735, 73 L.Ed.2d 396 (1982). Not only were the parties' initial briefs devoted exclusively to the issue of damages, but their supplemental briefs, filed at our direction following oral argument, reinforce the parties' emphasis on damages and the question of qualified immunity. See Appellants' Letter Brief of July 7, 1993 at 4 (qualified immunity described as the primary issue on appeal); Appellee's Letter Brief of July 8, 1993 at 5 ("instant appeals ... address the issues of liability and damages exclusively").
 
 
 28
 The district court had rejected the officials' claim to qualified immunity based, in part, on the perception that the issue "[was] not raised until post-trial briefing." Abdul-Akbar, 775 F.Supp. at 753 (citing Harlow v. Fitzgerald, 457 U.S. at 813, 102 S.Ct. at 2735 (rationale for qualified immunity is to dispose of "insubstantial claims without resort to trial")). Contrary to the district court, as we read the record, the issue of qualified immunity was raised explicitly as an affirmative defense in the officials' Answer to Abdul-Akbar's complaint, dated August 11, 1989. (A. 519).[14] Moreover, we note that, as here, the question of qualified immunity often cannot be resolved adequately until the dispositive facts have been presented at trial and reduced to findings. Cf., Anderson v. Creighton, 483 U.S. 635, 637-38, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).
 
 A.
 
 29
 The qualified immunity doctrine provides that
 
 
 30
 government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.
 
 
 31
 Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. The right an official is alleged to have violated must have been "clearly established" in a "particularized" sense. Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039. That is, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. Thus, qualified immunity does not apply if "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be unlawful." Good v. Dauphin County Social Servs. for Children and Youth, 891 F.2d 1087, 1092 (3d Cir.1989).
 
 
 32
 The district court stated, "We have no trouble concluding that the rights asserted in this action were clearly established at the time." Abdul-Akbar, 775 F.Supp. at 753. While conceding that Bounds "encouraged states to experiment with various packages of resources," id., the district court concluded, nonetheless, that Bounds "set forth sufficient guidelines for the range of acceptable plans that defendants should have known they were not fulfilling their responsibilities." Id. After reviewing the relevant case law, however, we have experienced substantially more difficulty than the district court did in mapping the "contours of the right" established in Bounds, and thus in determining the "right" that was clearly established during Abdul-Akbar's incarceration at MSU.
 
 
 33
 The Supreme Court in Bounds, which involved a North Carolina prison system, held "that the fundamental constitutional right of access to the courts requires prison officials to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498 (emphasis added). See id. at 829, 97 S.Ct. at 1499 (quoting Wolff v. McDonnell, 418 U.S. 539, 578-79, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974)) (holding prison officials must provide indigent inmates with access to "a reasonably adequate law library for preparation of legal actions") (emphasis added).
 
 
 34
 Significantly, the Court did not define the term "adequate" with specificity. Rather, the Court noted a number of "alternative means to achieve [the stated] goal," id. at 830, 97 S.Ct. at 1499, including "adequate" law libraries; "some degree of professional or quasi-professional legal assistance," id. at 831, 97 S.Ct. at 1499; "training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs," id.; or the use of attorneys as volunteers, part-time consultants or full-time staff counsel. Id.
 
 
 35
 Moreover, the Court affirmed the North Carolina district court's order leaving to North Carolina "the choice of what alternative would 'most easily and economically fulfill [the] duty." Id. at 819, 97 S.Ct. at 1493. The Court endorsed the North Carolina district court's finding that the means chosen were "economically feasible and practicable," and affirmed the holding that prison officials "were not constitutionally required to provide legal assistance as well as libraries." Id. at 820, 97 S.Ct. at 1494.[15] The Court concluded:
 
 
 36
 a legal access program need not include any particular element we have discussed, and we encourage local experimentation. Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards.
 
 
 37
 Bounds, 430 U.S. at 832, 97 S.Ct. at 1500.
 
 
 38
 Our own application of Bounds has contributed only slightly to a more precise standard of "adequacy." In Peterkin v. Jeffes, supra, we suggested without deciding that a paging system, alone, would not satisfy the legal access rights of segregated prisoners who were prohibited from visiting the law library and who were denied access to the prison law clinic. 855 F.2d at 1038 n. 22. (citing Valentine v. Beyer, 850 F.2d 951 (3d Cir.1988)).
 
 
 39
 In Valentine we held that the right articulated in Bounds is undiminished for prisoners held in close custody. 850 F.2d at 955; see also Peterkin, 855 F.2d at 1038. Again, however, we had little opportunity to define with exactitude the contours of the Bounds requirements, holding that an untrained legal research staff,[16] alone, was insufficient to safeguard the rights of inmates who had been denied access to the prison law library or to trained inmate paralegals. Valentine, 850 F.2d at 956.
 
 
 40
 As these cases suggest, each legal resource package must be evaluated as a whole on a case-by-case basis. Bounds, 430 U.S. at 832, 97 S.Ct. at 1500. Thus, prior evaluation of distinctive plans, such as those contemplated in Peterkin and Valentine, can do little to illuminate a public official's constitutional assessment of an entirely different plan. This is particularly so where, as here, the plan offers a unique "mix" of components, only some of which may have been evaluated previously by the courts, and even then, only in the discrete contexts of altogether disparate legal access packages.
 
 
 41
 This indeterminacy may be compounded further by the demands on corrections officials to factor security concerns, such as those raised in this case, into the fashioning of a legal access mix. As we cautioned in Peterkin,
 
 
 42
 [t]he difficult task in cases where a prisoner's right of access is at issue in a particular prison is to determine whether the mix of legal resources ... is sufficient to discharge constitutional obligations while also enabling [prison authorities] to meet their critical responsibility of ensuring internal order and institutional security. See O'Lone v. Shabazz, [482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ]; Turner v. Safley, [482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ].
 
 
 43
 Peterkin, 855 F.2d at 1038 (emphasis added). See Valentine, 850 F.2d at 958 (district court "paid due deference to the policy considerations recently mandated by the Supreme Court in O'Lone v. Shabazz," but properly declined "to assume a security problem" without evidence of such).
 
 B.
 
 44
 In the context of the instant case, we are mindful that the MSU library is not the primary facility at the DCC, but is merely an adjunct to the prison's main library. Hence, the "availability" of legal access at the MSU that commanded the district court's attention and that commands our attention is far different in character than the "availability" which would otherwise be found necessary at a penal institution's sole library facility, as was the case in Bounds.
 
 
 45
 As we can best determine, the standard to be applied is whether the legal resources available to a prisoner will enable him to identify the legal issues he desires to present to the relevant authorities, including the courts, and to make his communications with and presentations to those authorities understood. Thus, in order for segregated prisoners, who do not have access to an institution's main law library, to obtain legal access of "equal caliber" to the main library's resources, Valentine v. Beyer, 850 F.2d at 955, there must be some means by which documents and materials, which are not themselves available to the segregated inmates, can be identified by and furnished to such inmates in a timely fashion.
 
 
 46
 With the availability of basic federal and state[17] indices, citators, digests, self-help manuals and rules of court, along with some degree of paralegal assistance and a "paging system" through which photocopies of materials from an institution's primary facility may be obtained, we are persuaded that even a prisoner in a segregated unit such as the MSU would not be denied legal access to the courts. Nor could the absence from the satellite library of any particular volume or research aid be construed as a barrier to constitutionally required legal access. See Valentine v. Beyer, 850 F.2d at 955 ("practices or regulations are invalid [under Bounds] if they can be construed as imposing barriers to [legal] access").
 
 
 47
 By identifying these basic research categories, we do not intend to exclude other categories of treatises, digests or other research tools that may be peculiarly appropriate to a particular facility. Nor do we intend that the designated categories that we have suggested cannot vary with the particular institution. The hallmark of an adequate satellite system, which achieves the broad goals of Bounds is, in our opinion, whether the mix of paralegal services, copying services and available research materials can provide sufficient information so that a prisoner's claims or defenses can be reasonably and adequately presented. A court's task in applying the teaching of Bounds to any penal institution is not to prescribe the maximum requirements of an optimum library and legal resource facility, but only to determine, as best it can, whether the resources provided satisfy the minimum that Bounds requires. We believe that a satellite library of the nature which we have described will afford any prisoner in a segregated unit, such as MSU, sufficient, relevant materials to satisfy his constitutional right of access to the courts.
 
 C.
 
 48
 In our research, we have found that, at least up to this point, case law has not been definitive in establishing the threshold constitutional limits of legal access under Bounds. It is this state of affairs that has led us to attempt a refinement of such an instruction as it pertains to satellite libraries, an area in Bounds jurisprudence which has been virtually unchartered. Thus, it is not surprising that no bright line has been drawn between satellite legal resource plans that have been classified as either clearly constitutional or clearly unconstitutional. Because this is so, implementing officials who must rely on the instruction of the courts, and who are neither trained nor skilled professionals in the law, as these Delaware officials were not, have faced even greater difficulty in determining when their actions have violated the constitutional precepts of Bounds.
 
 
 49
 Indeed, this very case demonstrates how widely interpretations of Bounds may vary. As noted, the former magistrate judge (now a federal district court judge) who first disposed of Abdul-Akbar's claims held that summary judgment should be granted in favor of the officials because "[t]he record demonstrates that plaintiff has constitutionally adequate access to the courts by the provision of the MSU satellite law library and the paging system." (A. 529).
 
 
 50
 That decision was reached in the wake of a 1985 consent decree entered by a federal district court--a consent decree which involved the same maximum security facility that we are concerned with here. That consent decree established an MSU legal access plan designed expressly to satisfy constitutional requirements. See Consent Decree in Hearn v. Redman, No. 83-794 (D.Del.) (A. 555). Among other things, the Hearn v. Redman consent decree called for the acquisition of the MSU library holdings listed in Appendix A of the district court's opinion; the 9:00 a.m. to 11:00 a.m. and 1:00 p.m. to 3:00 p.m. visiting hours for the MSU library; the one-inmate-per-visit limitation (subject to security considerations); the full-time librarian for the main library; and the certified part-time paralegal (for at least six hours per week) to assist DCC inmates, including MSU inmates. (A. 555-558). Nothing in the district court's findings in the instant case even suggests that the officials here had violated any of the terms of the Hearn consent order. Rather, the district court inexplicably considered it "inexcusable that the defendants simply relied on the consent decree and ignored their constitutional obligations...." Abdul-Akbar, 775 F.Supp. at 752.[18]
 
 
 51
 We cannot agree that compliance with the Hearn consent order, which, as we have noted involved the same MSU facility as is involved here, can be construed as an act of abdication, let alone a violation, of constitutional responsibilities. Indeed, consent decrees, like all final judgments of the district courts, are reasonably presumed valid and in conformity with the law. United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932); Shreveport v. Cole, 129 U.S. 36, 42, 9 S.Ct. 210, 212, 32 L.Ed. 589 (1889). While the district court in this case may differ from the conclusions reached by its predecessor, we cannot regard the mere difference of opinion as the equivalent of establishing a clear constitutional right. The most that can be inferred from that difference of opinion is that the parameters of Bounds were still uncertain at the time of Abdul-Akbar's incarceration in MSU.
 
 
 52
 Indeed, if we ourselves were required to independently address the issue of constitutionality on this appeal--an issue which we need not, and do not, decide--we would have been strongly inclined to have held that Bounds' minimum requirements had been met in light of the blend of library and legal resources adopted at the MSU, as measured against the standard we have articulated. Our inclination has been informed by the officials' reliance upon, and compliance with, the Hearn v. Redman consent decree; the magistrate judge's analysis of this very case, which led her to uphold the constitutionality of MSU's legal resources; Abdul-Akbar's very conspicuous access to the library and legal resources available to MSU inmates, as evidenced by the voluminous photocopies he had acquired[19] and the numerous cases he had filed;[20] the substantial security considerations, dictated by the dangers posed by MSU inmates; and the district court's expansive reading of Bounds. It is against such a backdrop that we have expressed our disinclination to uphold Abdul-Akbar's constitutional claims and hold, rather, that the defendant officials are entitled to qualified immunity.
 
 
 53
 We are especially impressed not only with the historically inexact state of the Bounds minimum adequacy standard, but with the fact that the district court, the district court's predecessor, the magistrate judge, as well as this very panel have registered conflicting views over the proper application of the Bounds standard to the MSU. We would thus be exceedingly hard-pressed to hold that these four defendant officials, who are not as learned in the legal discipline as are those responsible for fashioning constitutional rules, could have been expected to recognize the existence and nature of the constitutional right that the district court held to be clearly established. Indeed, if members of the judiciary cannot reach a clear consensus regarding "[t]he contours of the right" articulated in Bounds, see Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039, can we reasonably expect more from those who are required to implement those rights?
 
 
 54
 The Supreme Court has observed that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Nothing in the record before us suggests that these officials may fairly be placed in either category. Nor do we conclude, given the inexplicitly defined Bounds standard and the particular mix of resources available here, that "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be unlawful." Good v. Dauphin County, 891 F.2d at 1092. We thus hold that the officials in this case were entitled to qualified immunity and, therefore, were shielded from liability for damages.[21]IV.
 
 
 55
 It is axiomatic that the federal courts may not decide an issue unless it presents a live case or controversy. See Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 810-11 (3d Cir.1989) (quoting DeFunis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974)) ("Federal courts, having jurisdiction only to decide actual cases and controversies, are 'without the power to decide questions that cannot affect the rights of litigants in the case before them.' "). This limitation " 'derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.' " DeFunis, 416 U.S. at 316, 94 S.Ct. at 1706 (quoting Liner v. Jafco, Inc., 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1966)). See also Hall v. Beals, 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969) ("a present, live controversy ... must exist if we are to avoid advisory opinions on abstract propositions of law"); 13A C. Wright, et al., Federal Practice and Procedure Sec. 3533, at 261 (1984) (central question in mootness problems is whether changes in circumstances that prevailed at the outset of litigation "have forestalled any occasion for meaningful relief").[22]
 
 
 56
 In Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975), Bradford had been temporarily paroled by the North Carolina Parole Board on December 18, 1974, and his status ripened into a complete release from supervision on March 25, 1975. Id. at 148, 96 S.Ct. at 347. The Supreme Court held that Bradford's constitutional challenge to the Parole Board's procedures for determining eligibility for parole became moot upon Bradford's "complete release from supervision." Id. "From that date forward it is plain that [Bradford] can have no interest whatever in the procedures followed by petitioners in granting parole." Id. Hence, the Court held that, in light of Bradford's release, the case did not present an issue that was " 'capable of repetition, yet evading review.' " Id. (quoting Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)).
 
 
 57
 In the instant case, Abdul-Akbar was released from the MSU on February 1, 1991. As in Weinstein, "[f]rom that date forward it is plain that [Abdul-Akbar could] have no interest [in the library and legal resources provided at the MSU]." See Weinstein, 423 U.S. at 148, 96 S.Ct. at 348. It is equally plain that, from that date forward, the district court could not provide Abdul-Akbar with meaningful relief by entering an injunctive order respecting the MSU in which Abdul-Akbar no longer was incarcerated.
 
 
 58
 Nor, as in Weinstein--and contrary to the holding of the district court--does this case present a question that is capable of repetition, yet evading review. The "capable of repetition" doctrine is a narrow exception to the mootness principle and is limited to cases presenting two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable likelihood that the same complaining party would be subjected to the same action again." Id. at 149, 96 S.Ct. at 349 (emphasis added).
 
 
 59
 Neither of the elements required to invoke this exception to the mootness doctrine is present here. First, Abdul-Akbar does not assert that mootness could be avoided on the ground that inmates at MSU fail to remain confined in that facility for a sufficient length of time to fully litigate a legal claim. Nor does he contend that a class action (never filed by Abdul-Akbar) would be unavailing. See Weinstein, 423 U.S. at 149, 96 S.Ct. at 349.
 
 
 60
 Second, unless we were attracted by the groundless assumption that Abdul-Akbar is likely to be incarcerated again at the MSU--an assumption that is clearly unsupported by the record--there simply is "no demonstrated probability that [Abdul-Akbar] will again be among [the MSU inmate population]." Id. The district court held otherwise, however, speculating that "there is a reasonable expectation that plaintiff could again be incarcerated at MSU." Abdul-Akbar, 775 F.Supp. at 755 (emphasis added). Such conjecture as to the likelihood of repetition has no place in the application of this exceptional and narrow grant of judicial power. See Weinstein, 423 U.S. at 148-49, 96 S.Ct. at 348; DeFunis, 416 U.S. at 318-20, 94 S.Ct. at 1706-07. Because the district court had no support or basis for its "reasonable expectation" that Abdul-Akbar "could" again be incarcerated at MSU, we cannot sustain the district court's speculative hypothesis.
 
 
 61
 Moreover, even if Abdul-Akbar were to be confined once again in the MSU, the current MSU Legal Access Plan, as approved by the district court on September 16, 1992 and implemented by the officials, see note 23, infra, has none of the purported deficiencies alleged by Abdul-Akbar in his complaint in this case. Thus, because there is no "reasonable likelihood" that Abdul-Akbar will again require access to the MSU library and legal resources as they existed during his incarceration at MSU, we are satisfied that this case does not present an issue capable of repetition, yet evading review. See, e.g., Weinstein, 423 U.S. at 148, 96 S.Ct. at 348.
 
 
 62
 We hold, therefore, that in the absence of a live case or controversy, the district court had no authority to impose the injunctive remedy it fashioned in favor of Abdul-Akbar, because it lacked "the power to decide [a question] that [could not] affect the rights of litigants in the case before [it]." DeFunis, 416 U.S. at 316, 94 S.Ct. at 1705.[23]
 
 V.
 
 63
 We will, therefore, vacate the district court's orders of October 7, 1991 and September 16, 1992. We will also remand this case to the district court and, consistent with the foregoing opinion, direct that the district court enter judgment against Abdul-Akbar and in favor of the defendant officials.[24]
 
 
 
 [1]
 Abdul-Akbar was convicted in state court of misdemeanor theft, reckless endangering, shoplifting, and third degree burglary. He began serving an eight-year sentence at DCC in March, 1986
 
 
 [2]
 The complaint originally named two additional government officials as defendants. However, the claims against former Magistrate Judge, now District Court Judge, Sue L. Robinson were dismissed on grounds of judicial immunity, see Abdul-Akbar v. Watson, 775 F.Supp. 735, 737 (D.Del.1991), and the claims against Donald Davis were dismissed by stipulation of the parties prior to trial. Id. at 738. Finally, claims against the Delaware Department of Corrections were dismissed on the ground that a state cannot be deemed a "person" within the meaning of 42 U.S.C. Sec. 1983. Id. at 737
 
 
 [3]
 The Magistrate Judge, in addition to holding that the MSU library and paging system provided adequate access to the courts, discussed at length the availability to Abdul-Akbar of the paralegal and attorney services. Moreover, she concluded that the defendants were entitled to summary judgment because Abdul-Akbar had not made a factual showing of actual injury; because there was no evidence that two of the defendants, Davis (against whom the complaint subsequently was dismissed) and Hobler, played any role in the alleged constitutional deprivation; and because the three supervisory officials, Watson, Redman and Risley, could not be held liable under section 1983 absent evidence that they "played an affirmative role in the deprivation of the plaintiff['s] rights," (A. 530-31) (internal quotation marks and citations omitted), nor could they be held liable on a theory of respondeat superior, or "on the basis of a failure to adequately supervise or control the conduct giving rise to plaintiff's substantive claims." Id. at 531 (citations omitted)
 
 
 [4]
 In 1991, after Abdul-Akbar's release from MSU, four six-shelf bookcases were installed in the MSU satellite library
 
 
 [5]
 The library inventory at the MSU, which conformed to the Hearn v. Redman decree, was introduced in evidence at trial, and was reproduced as "Appendix A" of the district court opinion at 775 F.Supp. at 756. In 1989, that inventory was expanded, see id. ("Appendix B"), and was augmented again in May 1991. "Appendix C" to the district court's opinion, id. at 757, reflects the inventory available at the time of the trial, which, as stated, had followed Abdul-Akbar's release from the MSU on February 1, 1991
 
 
 [6]
 The officials, in characterizing this finding as clearly erroneous, call our attention to the testimony of inmates James Riley, Nathaniel Bagwell, Sakee Ali Nasir, Courtland Pitts, Ward Evans, Jonathan Murray, Walter Phillips, and William Hicks, none of whom, the officials argue, corroborated Abdul-Akbar's testimony regarding the alleged closure of the MSU library between July, 1987 and late 1989
 
 
 [7]
 Kobus testified that only one photocopying machine was available, so that MSU materials were copied in the morning and on Mondays from 6:00 p.m. to 10:00 p.m
 
 
 [8]
 This finding was vigorously challenged by the officials, who claimed that the testimony disclosed a limitation of five photocopied cases per request, and not five cases per week
 
 
 [9]
 At the time of trial, the Department of Corrections had employed six statewide Correctional Legal Assistants, including Ms. Kobus. The DCC also provided the services of five inmate librarians
 
 
 [10]
 See, e.g., Abdul-Akbar, 775 F.Supp. at 743-44 (citing notes of paralegal Pete Horvath, describing Abdul-Akbar as angry over Horvath's failure to draft a response to a pending motion, and over Horvath's statement that his job was to take interviews and relay "info to inmate paralegals.")
 
 
 [11]
 Specifically, the district court's order of October 7, 1991, among other things, decreed that "[j]udgment is awarded to plaintiff and against defendants in the amount of $750 compensatory damages and $750 punitive damages." We read that judgment to provide a total damage award of $1,500, rather than damages of $1,500 against each of the defendant officials. In light of our ultimate disposition, however, no issue as to the quantum of damages is presented
 
 
 [12]
 The court also awarded Abdul-Akbar attorneys' fees, pursuant to 42 U.S.C. Sec. 1988. (A. 18). However, the parties negotiated and privately stipulated to a payment of attorney's fees. Although that fee agreement is not a matter of public record, at oral argument Abdul-Akbar's counsel represented that he had received an undisclosed amount from the defendant officials, and that the private agreement did not provide for a refund in the event that the district court's opinion were reversed on appeal, so that Abdul-Akbar could no longer be deemed a prevailing party. See 42 U.S.C. Sec. 1988
 
 
 [13]
 Indeed, Abdul-Akbar's cross-appeal, through which he seeks an increased damage award, underscores his own emphasis on the issue of damages on this appeal
 
 
 [14]
 The Answer expressly asserts, among affirmative defenses, "The defendants are shielded from liability to the plaintiff under the doctrine of qualified immunity." (A. 519)
 
 
 [15]
 See also Bounds, 430 U.S. at 825, 97 S.Ct. at 1496 (noting that while "economic factors may ... be considered, for example, in choosing the methods used to provide meaningful access ... the cost of protecting a constitutional right cannot justify its total denial")
 
 
 [16]
 The law library paralegals, to whom the closed custody prisoners did have access, were characterized as a "messenger service." Valentine, 850 F.2d at 955
 
 
 [17]
 Our use of the term "state" in this context refers to the state in which the prisoner is incarcerated
 
 
 [18]
 The district court also appears to have read Bounds to mandate, in addition to the provisions of the Hearn v. Redman consent decree, that professional quality legal advice be afforded to MSU inmates. We cannot agree. While Bounds requires access to basic authorities, fundamental to the legal needs of inmates, see text, supra, it does not require the appointment of counsel for purposes of postconviction relief. Murray v. Giarratano, 492 U.S. 1, 7, 11-12, 109 S.Ct. 2765, 2769, 2771, 106 L.Ed.2d 1 (1989). Nor, contrary to the district court's implicit holding, is the finely tuned and exhaustive legal research available in law schools or large law firms the measure against which the Bounds minimum adequacy standard is to be tested
 
 
 [19]
 Abdul-Akbar received 74,553 photocopies through the MSU paging system
 
 
 [20]
 Abdul-Akbar had filed 125 actions in the District Court for the District of Delaware, 114 of which were pending at the time of trial in this case
 
 
 [21]
 Having thus determined that qualified immunity shields these officials from liability for damages, we need not reach the merits of Abdul-Akbar's cross-appeal, seeking a remand to the district court "for an increased award of damages." Abdul-Akbar Brief at 41
 
 
 [22]
 The posture of this case before the district court closely resembles the mootness paradigm under Article III, raising identical issues of federal judicial power and authority. See Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974)
 
 
 [23]
 Even if the district court had possessed authority--which it did not--to issue the October 7, 1991 injunction, the officials' appeal from that order may well have been rendered moot in light of representations made by the officials' counsel at oral argument, to the effect that the officials have no intention of departing nor retreating from the January 1992 Plan approved by the district court's order of September 16, 1992. See Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 810-11 (3d Cir.1989) (quoting In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 150 n. 6 (3d Cir.1986)) (" 'an appeal must be dismissed as moot when an event occurs that prevents the appellate court from granting any effective relief, even if the dispute [were to be] decided in favor of the appellant' ")
 
 
 [24]
 We need not, and do not, enter an order directing the district court to dismiss Abdul-Akbar's complaint, see United States v. Munsingwear, Inc., 340 U.S. 36, 39-40, 71 S.Ct. 104, 106-07, 95 L.Ed. 36 (1950), inasmuch as damages were sought against the defendant officials and, as discussed in text, supra, the officials are entitled to judgment in their favor