

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-11-1995

# Bieregu v Reno

Precedential or Non-Precedential:

Docket 94-5719

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Bieregu v Reno" (1995). *1995 Decisions*. Paper 184.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/184

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-5719


POLYNS BIEREGU,
Appellant,
v.

JANET RENO; L. YEARBY; G. BERMAN, All Employees
of Mail Room Staffs.


Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 94-2775)


Submitted Under Third Circuit LAR 34.1(a)
May 2, 1995

BEFORE:  MANSMANN, SCIRICA, and SAROKIN, Circuit Judges

(Filed July 11, 1995)


OPINION OF THE COURT

Polyns Bieregu, #15267-050
HCR-Unit
Fairton FCI
P.O. Box 420
Fairton, NJ 08320

Appellant pro se

Faith S. Hochberg
United States Attorney
Paul A. Blaine

Assistant United States Attorney
Mitchell H. Cohen Courthouse
4th & Cooper Streets
P.O. Box 1427
Camden, NJ 08101

Attorneys for appellees

SAROKIN, Circuit Judge:

A prisoner brought this action pro se against prison officials, alleging that by repeatedly opening properly marked incoming legal mail outside of his presence, those officials had violated his constitutional rights.[1] Holding that defendants enjoyed qualified immunity because the law in this area was unsettled in our circuit, the district court granted summary judgment in favor of the officials. Plaintiff appeals.

## I.

The district court had jurisdiction pursuant to 28 U.S.C. §1331. Plaintiff filed a timely notice of appeal, and we have jurisdiction pursuant to 28 U.S.C. §1291.

---

[1]Plaintiff also named Attorney General Janet Reno as a defendant and alleged two state law negligence claims against all defendants. On appeal, he mentions the dismissal of neither the state law claims nor the federal claims as to Attorney General Reno, and hence we need not reach these issues. We note in any event that (a) the district court held that tort claims against federal employees may arise only under the Federal Tort Claims Act, 28 U.S.C. §1346; and (b) to be liable for a constitutional violation a defendant must have some causal connection to the wrongdoing. Mark v. Borough of Hatboro, ___ F.3d ___, 1995 WL 138433, at *18 and n.13 (3d Cir. 1995); Rizzo v. Goode, 423 U.S. 362, 377 (1976). Plaintiff has offered no evidence that the Attorney General in any way caused, consented to, or tacitly approved the conduct of the prison officials herein.

Plaintiff Polyns Bieregu is incarcerated at the federal prison in Fairton, New Jersey. He alleges that on numerous occasions and outside his presence, prison mailroom employees opened and read mail addressed to him from federal judges, in violation of the Constitution, federal regulations, and internal Bureau of Prisons ("BOP") guidelines.

The federal regulatory framework for handling prisoner mail is straightforward. The regulations distinguish between incoming "general mail," which the Warden must open and inspect and may read, and incoming "special mail," which the Warden may open "only in the presence of the inmate for inspection for physical contraband and the qualification of any enclosures as special mail." 28 C.F.R. §§540.14(a), 540.18(a).[2] Special mail includes incoming mail from federal and state courts. §540.2(c). In order to receive the special handling, incoming special mail must be marked "Special Mail – Open only in the presence of the inmate" and have a clearly identified sender. §§540.2(c), 540.18(a). According to a BOP Policy Statement, however, mail "from the chambers of a federal judge . . . should be given special handling," even when it lacks the precise marking. Federal Bureau of Prisons, Program Statement No. 5265.08 (October 1, 1985), §13(a). For convenience, we will refer to correspondence between an inmate and attorney as "attorney mail" and to correspondence between an inmate and a state or federal

_____

[2]Unless otherwise noted, all subsequent references to federal regulations are to 28 C.F.R.

judge, clerk's office, or other courthouse address as "court mail." We use the phrase "legal mail" as a general term including both attorney and court mail.

Plaintiff does not attack the general BOP scheme for handling mail, nor the specific authority of BOP employees to open incoming legal mail in his presence. Rather, plaintiff contends that in repeatedly opening court mail outside his presence, the mailroom employees violated his rights to "confidential and uncensored commications" [sic] and to "access to the court" under the First, Fourth, Sixth, and Fourteenth Amendments. As approved in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), plaintiff sues directly under the Constitution.

In response to defendants' motion for summary judgment, plaintiff supplied evidence that five pieces of mail from federal judges were opened outside his presence within a three month period. The mail concerned civil proceedings to which plaintiff was a party. Plaintiff alleges further that on another occasion, the mailroom employees opened and damaged a scheduling order in a civil forfeiture proceeding. Bieregu claims that because the order was damaged, he failed to file a timely brief and his appeal was dismissed.

An internal review by the prison determined that on at least three of the five alleged occasions, mailroom employees did open plaintiff's properly marked legal mail outside his presence. The employees claim they did not read the mail and submitted affidavits denying they had opened it intentionally.

The district court concluded "we cannot say that a reasonable trier of fact would be compelled to find that defendants' actions were the result of mere negligence." Bieregu v. Reno, No. 94-2775, slip op. (D.N.J. Nov. 4, 1994), at 5. It went on to conclude that "a policy or practice of opening properly identified legal mail outside the presence of the inmate" is a constitutional violation. Id. at 9. Nevertheless, the court determined that because the law in this circuit is not clearly established as to whether such conduct rises to the level of a constitutional violation, the officials were entitled to qualified immunity.

Our review of a district court's grant of summary judgment is plenary. In re City of Philadelphia Litigation, ___ F.3d ___, 1995 WL 88161, *15 (3d Cir. 1995). We consider whether there are genuine issues as to material facts and whether defendants are entitled to judgment as a matter of law. Id.; Fed.R.Civ.P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987). In so determining, we will resolve all reasonable doubts and draw all reasonable inferences in favor of the nonmoving party. Meyer v. Riegel Products Corp., 720 F.2d 303, 307, n.2 (3d Cir. 1983), cert. dismissed, 465 U.S. 1091 (1984).

## II.

By definition a sentence of imprisonment involves a loss of one's liberty, and by necessity a substantial loss of one's privacy. Yet confinement does not result in the forfeiture of

all constitutional rights. Indeed, the closing of the prison gates upon an inmate is punishment enough in most instances, and any attempt to isolate inmates completely from the outside world might not only violate their constitutional rights, but would disserve the interests of a society hoping to release prisoners to become law-abiding citizens. Thus the Supreme Court has reminded us that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. 78, 84 (1987). See also Wolff v. McDonnell, 418 U.S. 539, 555-56 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this country"). Nor do those walls "bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'" Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).

Accordingly, the Supreme Court has recognized that persons convicted of serious crimes and confined to penal institutions retain the right to petition the government for the redress of grievances, Johnson v. Avery, 393 U.S. 483 (1969); the right to be free from racial segregation, Lee v. Washington, 390 U.S. 333 (1968); the right to due process, Wolff, supra; the right of free speech, Abbott, 490 U.S. at 410, n.9; the right of meaningful access to the courts, Bounds v. Smith, 430 U.S. 817, 828 (1977); and the right to exercise substantial religious freedom, Cruz v. Beto, 405 U.S. 319 (1972); O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).

The Court has also recognized, however, that the rights of prisoners "must be exercised with due regard for the

'inordinately difficult undertaking' that is modern prison administration." Abbott, 490 U.S. at 407 (quoting Turner, 482 U.S. at 85). Prison officials must weigh the need for internal order and security against the rights of prisoners, as well as the constitutional rights afforded "those on the 'outside' who seek to enter that environment, in person or through the written word." Abbott, 490 U.S. at 407.

Courts have been called upon to review the balance struck by prison officials between the penal institution's need to maintain security within its walls and the rights of prisoners and non-prisoners. As former Chief Judge Higginbotham has written for our court, "'courts have learned from repeated investigation and bitter experience that judicial intervention is indispensable if constitutional dictates--not to mention considerations of basic humanity--are to be observed in the prisons.'" Peterkin v. Jeffes, 855 F.2d 1021, 1033 (3d Cir. 1988) (quoting Rhodes v. Chapman, 452 U.S. 337, 354 (1981) (Brennan, J. concurring)).

Against this background we turn to the conduct of defendants regarding plaintiff's incoming court mail.

### III.

The district court granted summary judgment on the grounds that defendants enjoyed qualified immunity, but before reaching this issue we must first determine whether plaintiff has alleged a constitutional violation. In re City of Philadelphia, ___ F.3d at ___, 1995 WL 88161, at *15; Siegert v. Gilley, 500 U.S. 226, 231 (1991). This analysis involves two steps: determining (1)

whether any of plaintiff's constitutional rights are infringed by the conduct alleged herein; and if so, (2) whether that infringement rises to the level of a constitutional violation, given the specialized standard of review applied to prison regulations and practices.

A number of courts of appeals have determined that opening properly marked incoming attorney or court mail outside a prisoner's presence, or reading such mail, infringes the Constitution. Though finding a constitutional violation, the Seventh, Eighth, and Eleventh Circuits identified no right in particular. See Castillo v. Cook County Mail Room Department, 990 F.2d 304, 307 (7th Cir. 1993) (per curiam) (allegation that prison officials opened three pieces of incoming court mail outside inmate's presence states "colorable claim" of constitutional violation); Lemon v. Dugger, 931 F.2d 1465, 1468 (11th Cir. 1991) (prison official violated prisoner's "constitutional right not to have his mail read" where one piece of incoming attorney mail opened and read in inmate's presence); Jensen v. Klecker, 648 F.2d 1179, 1182–83 (8th Cir. 1981) (allegations that prison officials had deliberately and repeatedly opened incoming and outgoing attorney mail outside prisoner's presence sufficient to defeat officials' motion for summary judgment). The Sixth and Tenth Circuits looked to the First Amendment. See Lavado v. Keohane, 992 F.2d 601, 609–10 (6th Cir. 1993) ("opening/reading" incoming court mail outside prisoner's presence in arbitrary or capricious fashion violates First Amendment); Ramos v. Lamm, 639 F.2d 559, 582 (10th Cir.

1980) (opening outgoing court and attorney mail outside presence of inmate violates the First Amendment), cert. denied, 450 U.S. 1041 (1981). The Second Circuit also relied on the First Amendment, but on the Petition Clause in particular. See Washington v. James, 782 F.2d 1134, 1139 (2d Cir. 1986) (allegation that prison officials repeatedly opened outgoing attorney mail states claim for violation of rights to petition and to correspond with legal counsel). The Fifth Circuit relied on a constitutional right of access to the courts, arising under the Due Process Clause. See Taylor v. Sterrett, 532 F.2d 462, 475 (5th Cir. 1976) (prisoner's right of access "requir[es] that incoming prisoner mail from courts . . . be opened only in the presence of the inmate"). Taylor, however, may no longer be good law in the Fifth Circuit. See Brewer v. Wilkinson, 3 F.3d 816, 825 (5th Cir. 1993) (opening incoming attorney or court mail outside inmate's presence does not violate prisoner's rights to free speech or court access), cert. denied, ___ U.S. ___, 114 S.Ct. 1081 (1994); Walker v. Navarro County Jail, 4 F.3d 410, 413 (5th Cir. 1993). Lastly, in the Ninth Circuit, Judge Reinhardt has argued in dissent that the right to privacy was at stake. Stevenson v. Koskey, 877 F.2d 1435, 1443 (9th Cir. 1989) (Reinhardt, J., dissenting) ("reading legal mail is a violation of the prisoner's privacy rights").

Similarly, district courts in our circuit, like the one herein, have concluded that to read legal mail or to open it outside a prisoner's presence violates the Constitution, though they too have not agreed as to the constitutional rights at

issue.  See Jordan v. Fauver, ___ F.Supp. ___, 1995 WL 139274, at *4-5 (reading legal mail in presence of inmate violates his right to court access) (D.N.J. 1995); Proudfoot v. Williams, 803 F.Supp. 1048, 1052 (E.D.Pa. 1992) (opening and scanning outgoing attorney and court mail in presence of prisoner violates inmate's rights to petition, counsel, and court access); Thornley v. Edwards, 671 F.Supp. 339, 342 (M.D.Pa. 1987) (opening incoming court mail outside presence of inmate violates his rights to counsel and court access), mot. denied, summ. judg. granted, 1988 WL 188333 (M.D.Pa. 1988); Carty v. Fenton, 440 F.Supp. 1161, 1162-63 (M.D.Pa. 1977) (opening incoming court mail outside inmate's presence violates his right to court access).

Only once have we confronted the question of whether opening and reading an inmate's legal mail violates the Constitution. See Allen v. Aytch, 535 F.2d 817 (3d Cir. 1976).  We did not reach the issue, however, relying instead on Justice Brandeis's concurrence in Ashwander v. Tennessee Valley Authority, 297 U.S. 288 (1936) to remand for consideration of a non-constitutional argument not raised in the district court.  Allen, 535 F.2d at 823.

**A.   Freedom of speech**

As Justice Holmes recognized years ago, "[t]he United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues."  United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 437 (1921) (Holmes, J., dissenting).  Thus the Supreme

Court has generally treated interference with the mail as implicating the First Amendment right to free speech. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 69 & n.18 (1983); Blount v. Rizzi, 400 U.S. 410, 416 (1971); Lamont v. Postmaster General, 381 U.S. 301, 307–08 (1965).

In Procunier v. Martinez, 416 U.S. 396 (1974), the Supreme Court invalidated California prison regulations which provided for the routine censorship of inmates' outgoing personal correspondence, on the grounds that the regulations violated the free speech rights of the prisoners' correspondents. 416 U.S. at 408 ("[w]hatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech"). See also Wolff, 418 U.S. at 576–77.

In the years after Procunier and Wolff, however, the Court abandoned the distinction between the free speech rights of inmates and their correspondents on the outside. Abbott, 490 U.S. at 411, n.9 ("any attempt to forge separate standards for cases implicating the [First Amendment] rights of outsiders [and inmates] is out of step with the intervening decisions").

Clearly, then, prisoners do not forfeit their First Amendment rights to use of the mails. For example, prison officials violate a prisoner's First Amendment rights when they refuse to deliver incoming personal mail simply because it is written in a language other than English. Ramos, 639 F.2d at 581. Similarly, officials violate the First Amendment when they refuse to deliver mail that allegedly could be emotionally

disturbing to an inmate, in the absence of a psychiatric determination that the mail would indeed be upsetting. Id. at 581-82.

The Fifth Circuit has concluded that "[t]he precise contours of a prisoner's right to free speech are . . . obscure," Brewer, 3 F.3d at 821. However, we need not determine the exact outer limits of a prisoner's right to free speech, for we are satisfied that a pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes communication protected by the right to free speech. Such a practice chills protected expression and may inhibit the inmate's ability to speak, protest, and complain openly, directly, and without reservation with the court.

Here, plaintiff's complaint alleged that on fifteen occasions defendants opened his legal mail outside his presence. In response to this motion, he supplied evidence documenting five instances in which his incoming court mail was opened in a three month period. Defendants admit that on three of the five occasions documented by plaintiff, they did open his incoming court mail outside his presence. Because we must view the facts in the light most favorable to plaintiff, the non-moving party, and draw all reasonable inferences therefrom, we conclude that there is sufficient evidence in the record for a reasonable person to infer that there exists a pattern and practice of opening plaintiff's incoming court mail outside his presence.

Plaintiff also alleges that defendants censored his mail. In the context of the First Amendment and prison mail, however,

censorship means altering or "withhold[ing] delivery of a particular letter." Procunier, 416 at 417. See Wolff, 418 U.S. at 576 ("freedom from censorship is not equivalent to freedom from inspection or perusal"). But see Taylor, 532 F.2d at 469 (opening prisoner's mail is "indirect censorship"). Plaintiff points to only one occasion in which his mail was damaged, namely when the briefing schedule was cut. We decline to hold that a single instance of damaged mail rises to the level of constitutionally impermissible censorship, and hence this allegation cannot withstand the motion for summary judgment.

## B.    Right to meaningful court access

The Supreme Court has held that "prisoners have a constitutional right of access to the courts." Bounds, 430 U.S. at 821. See also Johnson, 393 at 489; Wolff, 418 U.S. at 577–80. The Court explained that the access must be "adequate, effective, and meaningful" to comport with the Constitution. Bounds, 430 U.S. at 822. Yet, as the Fifth Circuit has observed, "[p]erhaps because their textual footing in the Constitution is not clear, these principles [of court access] suffer for lack of internal definition and prove far easier to state than to apply." Morrow v. Harwell, 768 F.2d 619, 623 (5th Cir. 1985).

### 1. Source of the right

The Bounds decision made only one reference to a particular constitutional source, describing the prisoners' complaint as alleging a violation of their "Fourteenth Amendment rights." 430 U.S. at 818. Since that decision, courts have concluded that the right arises under the First Amendment right to petition,

Proudfoot, 803 F.Supp. at 1052; Jackson v. Procunier, 789 F.2d 307, 310 (5th Cir. 1986); Nordgren v. Milliken, 762 F.2d 851, 853 (10th Cir.), cert. denied, 474 U.S. 1032 (1985); Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir. 1981); Washington, 782 F.2d at 1139; the Sixth Amendment right to counsel, Proudfoot, 803 F.Supp. at 1052; Thornley, 671 F.Supp. at 342; Stover v. Carlson, 413 F.Supp. 718, 722 (D.Conn. 1976); and the Due Process Clause. Jackson, 789 F.2d at 310; Nordgren, 762 F.2d at 853. Adding more spice to the soup, the Supreme Court has referred to the "equal protection guarantee of 'meaningful access.'" Pennsylvania v. Finley, 481 U.S. 551, 557 (1987). There is also a theory that meaningful court access is protected under the Privileges and Immunities Clause. See Nordgren, 762 F.2d at 853. We have previously noted the various theories, without making our own selection. See Peterkin, 855 F.2d at 1036, n.18.

### a. Right to petition

The First Amendment's right to petition "has a pedigree independent of--and substantially more ancient than--the freedoms of speech and press." San Filippo v. Bongiovanni, 30 F.3d 424, 443 (3d Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 735 (1995). In colonial times, it referred primarily to the power of the people to petition their legislatures. In fact, a significant amount of colonial legislation was initiated by citizen petition. Akhil R. Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1156 (1991). See also Note, A

<u>Short History of the Right to Petition Government for the Redress of Grievances</u>, 96 Yale L.J. 142 (1986).[3]

In the modern era, the Supreme Court has held that the Petition Clause encompasses a right of access not only to the legislative branch, but to the courts as well. <u>California Motor Transport Co. v Trucking, Unlimited</u>, 404 U.S. 508, 510 (1972); <u>Bill Johnson's Restaurants Inc. v. NLRB</u>, 461 U.S. 731, 741 (1983) ("the right of access to the courts is an aspect of the First Amendment right to petition"). Thus in <u>San Filippo</u> we treated the filing of a lawsuit as implicating the Petition Clause. 30 F.3d at 440, n.18. In its most recent examination of the clause, the Supreme Court appeared to treat the right to petition as subsumed within the broad First Amendment right to freedom of expression. <u>McDonald v. Smith</u>, 472 U.S. 479, 482 (1985) (right to petition is merely "an assurance of a particular freedom of expression"). In <u>San Filippo</u>, in the context of public employment, we nevertheless distinguished between a petition and mere speech to hold that "filing a non-sham petition is not a constitutionally permissible ground for discharge." 30 F.3d at 443. We conclude that the First Amendment right to petition, as

---

[3]At the founding, the Petition Clause also implied a "congressional duty to respond." Amar, <u>Bill of Rights</u>, 100 Yale L.J. at 1156. In the Civil War era, however, Congress enacted rules abolishing the duty to respond, a change later sanctioned by the Supreme Court. Note, <u>A Short History</u>, 96 Yale L.J. at 164; <u>Smith v. Arkansas State Highway Employees</u>, 441 U.S. 463, 465 (1979) (per curiam) (constitution does not require government "to listen [or] to respond" to citizen petition); <u>Minnesota State Bd. for Community Colleges v. Knight</u>, 465 U.S. 271, 285 (1984).

currently interpreted, is a birthplace for the right of court access.

### b. Right to counsel

The plain language of the Sixth Amendment is limited to criminal proceedings,[4] and thus, for example, the Supreme Court has determined that the Amendment's guarantee of a right to counsel does not extend to habeas corpus proceedings, which are civil. Finley, 481 U.S. at 555. Moreover, in Wolff, the most recent Supreme Court examination of the status of a prisoner's legal mail, the Court held that "[a]s to the Sixth Amendment, its reach is only to protect the attorney-client relationship from intrusion in the criminal setting." 418 U.S. at 576 (emphasis added). See also Taylor, 532 F.2d at 472. Accordingly, as to civil actions, we conclude that the Sixth Amendment is not a promising place for genealogical research on the right of court access.

Here, plaintiff characterizes the five pieces of opened mail as regarding "a civil rights action" against prison officials. Pl.Br. at 2. Two of the letters were apparently related to Bieregu v. Reno, No. 93-4894 (D.N.J.), a civil action. In addition, the briefing schedule allegedly opened and damaged

---

[4]"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S.Const., Am. VI.

concerned a civil forfeiture case. Certainly plaintiff offered no evidence in response to the motion for summary judgment indicating that the opened mail involved a criminal proceeding. Thus we will explore plaintiff's Sixth Amendment claim no further.

### c. Due process

As noted, the Bounds decision characterized the plaintiffs' allegations of a denial of court access as arising under the Fourteenth Amendment. 430 U.S. at 818. In Procunier, the Court held that California's mail censorship regulations violated the "constitutional guarantee of due process of law [which] has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights." 416 U.S. at 419. See also Ex parte Hull, 312 U.S. 546, 549 (1941) (invalidating prison official's refusal to mail inmate's habeas corpus petition); Wolff, 418 U.S. at 576 (referring to "due process claim based on access to the courts"). Thus there is ample authority to conclude that among the progeny of the Due Process Clause is the right of court access.

We note that defendants are federal officials, so plaintiff's reliance on the Fourteenth Amendment is misplaced; if grounded in the Due Process Clause, his right of access arises under the Fifth Amendment. We will construe the pro se complaint liberally, however, Todaro v. Bowman, 872 F.2d 43, 44 n.1 (3d Cir. 1989), and conclude that it alleges that the repeated

opening of properly marked incoming court mail outside his presence has violated his Fifth Amendment right to court access.

## 2. Scope of the right

The Supreme Court's characterization of the right to court access as requiring "adequate, effective, and meaningful" access, Bounds, 430 U.S. at 822, provides only limited guidance as to the scope of the right's protection. We have noted that "the Court did not define the term 'adequate' with specificity," Abdul-Akbar v. Watson, 4 F.3d 195, 202 (3d Cir. 1993); unfortunately, "[o]ur own application of Bounds has contributed only slightly to a more precise standard of 'adequacy.'" Id. See also Brewer, 3 F.3d at 821 ("the precise contours of a prisoner's right of access to the courts remain somewhat obscure").

Although our decisions have primarily concerned the adequacy and accessibility of prison law libraries and legal staff, see Peterkin, supra; Valentine v. Beyer, 850 F.2d 951 (3d Cir. 1988); Abdul-Akbar, supra, a few principles emerge. Prison measures are to be evaluated individually and in sum. Abdul-Akbar, 4 F.3d at 203. A court must determine whether the means of access "give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Bounds, 430 U.S. at 825. "'[T]he touchstone . . . is meaningful access to the courts.'" Peterkin, 855 F.2d at 1037 (quoting Bounds, 430 U.S. at 823) (internal quotation omitted).

Relying principally on our decision in Hudson v. Robinson, 678 F.2d 462 (3d Cir. 1982), the government contends that unless a prisoner is "actually denied" access to the courts, his right

to meaningful access has not been violated. Hudson, 678 F.2d at 466. See also Proudfoot, 803 F.Supp. at 1053, n.8; Walker, 4 F.3d at 413 (opening incoming legal mail outside prisoner's presence does not violate right to court access unless "his position as a litigant was prejudiced by the mail tampering"); Brewer, 3 F.3d at 825.

This analysis ignores our later decision in Peterkin. There we distinguished "ancillary" aspects of court access, which "may affect merely comfort or convenience without depriving a prisoner of access," 855 F.2d at 1041, from prison practices that are "central, not peripheral, to the right of access to the courts." Id. The former require a showing of actual injury but the latter do not. Id. at 1041–42.

In Peterkin we characterized as "ancillary" an action seeking to require the prison to supply gratis pads, pens, pencils, postage, and photocopying to prisoners who had funds in their institutional accounts sufficient to purchase the items. See Peterkin, 855 F.2d at 1041–42 (discussing Kershner v. Muzurkiewicz, 670 F.2d 440 (3d Cir. 1982) (in banc)). We also described as ancillary the issue in Hudson itself, where a prisoner sued because he was once required to wait ten days to have a document notarized. Peterkin, 855 F.2d at 1039, 1041–42 (discussing Hudson, supra). By contrast, the adequacy of a prison law library concerned issues central to the right of court access. Id.

Plaintiff does allege he was injured by the damage to his briefing schedule, but he offers no evidence to establish that

the damage obscured the dates, nor to dispute defendants' contention that he received a separate notice from the clerk's office pursuant to Third Circuit LAR Misc. 107.2(a), informing him that he had fourteen days to file a brief else the appeal would be dismissed.  We conclude that plaintiff has not demonstrated that he has suffered an actual injury regarding court access.

Nonetheless, and although the question is close, we conclude that repeated violations of the confidentiality of a prisoner's incoming court mail is more central than ancillary to the right of court access, and thus no showing of actual injury is necessary for plaintiff to establish that the right has been infringed.  We are satisfied that a practice of opening court mail outside an inmate's presence implicates a core aspect of the right.  Such conduct inhibits an inmate's ability to protect his legal rights in court and frustrates the principles of <u>Bounds</u>. Unlike free pens or slight delays in notarizing documents, interference with such mail threatens the primary, often sole means by which a prisoner can exercise his constitutional rights. Without assurances that legal correspondence, including both attorney and court mail, is confidential and secure, court access can hardly be effective, adequate, and meaningful.

In so holding, we distinguish between a single, inadvertent instance of an inmate's court mail being opened outside his presence, and a pattern and practice of such conduct. Notwithstanding our characterization that protection of court mail is central to an inmate's right of court access, and thus no

actual injury need be shown in the face of a pattern and practice of opening such mail outside of the inmate's presence, we do not necessarily rule out the need to show such injury where the opening is isolated and inadvertent. See Castillo, 990 F.2d at 306-07 (allegations that three pieces of incoming court mail were opened outside inmate's presence states colorable constitutional claim); Washington, 782 F.2d at 1139 (distinguishing allegation that two pieces of legal mail were opened outside inmate's presence, which would indicate "continuing activity" and therefore constitutional violation, from "single isolated instance," which would not). Cf. Morgan v. Montanye, 516 F.2d 1367, 1370-72 (2d Cir. 1975) (single instance of legal mail opened outside presence of inmate does not violate Constitution), cert. denied, 424 U.S. 973 (1976); Boyd v. Petsock, 795 F.Supp. 743 (W.D.Pa. 1992) (same).

We need not specify a minimum number of instances in which properly marked legal mail is opened outside a prisoner's presence sufficient to eliminate the requirement of showing actual injury. Determining whether a prisoner has demonstrated a custom or practice is a fact-bound inquiry.

Lastly, we note several distinctions that may clarify our discussion of the right of court access as applied to prison legal mail. First, reading legal mail would appear to infringe the right of access even more than simply opening and inspecting it. Second, as the Supreme Court noted, the only way to ensure that mail is not read when opened, and thus to vindicate the right to access, is to require that it be done in the presence of

the inmate to whom it is addressed.  <u>Wolff</u>, 418 U.S. at 576–77. Third, interference with attorney mail probably infringes the right of court access even more than interference with court mail, whether the correspondence relates to a criminal conviction, a subsequent collateral proceeding, or a civil suit to protect an inmate's constitutional rights.  Of all communications, attorney mail is the most sacrosanct.  Thus, although the Sixth Amendment is not recognized as the repository for such a shield in civil matters, <u>see</u> <u>Finley</u>, <u>supra</u>, the right of court access guarantees the privacy of attorney–client communications.  <u>See</u> John W. Palmer, <u>Constitutional Rights of Prisoners</u>, 4th ed., at 40 (Anderson Publishing Co. 1991) ("A basic corollary to the right of access to the courts is the inmate's right to communicate with an attorney concerning the validity of his conviction or the constitutionality of conditions within the detention facility").

We conclude that a pattern and practice of opening plaintiff's properly marked incoming court mail outside his presence impinges upon his constitutional rights to free speech and court access.[5]  This determination does not depend on the

_____

[5]We add a note about the right to privacy, because plaintiff relies on the Fourteenth Amendment and the district court cited the decision in which Judge Reinhardt, in dissent, stated "reading legal mail is a violation of the prisoner's privacy rights." <u>Stevenson</u>, 877 F.2d at 1443.  The Supreme Court has recognized that the right to privacy survives incarceration. <u>Turner</u>, 482 U.S. at 95–99. <u>See</u> <u>also</u> <u>Monmouth County Correctional Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 334 (3d Cir. 1987), <u>cert. denied</u>, 486 U.S. 1006 (1988).  Although authorized by §540.18, routine reading of purely personal letters from friends and family, those daily expressions of affection and love, may implicate an inmate's right to privacy.  Certainly personal

mere violation by prison officials of §540.18 and Policy Statement §13(a), which by itself does not establish a constitutional violation.  Daniels v. Williams, 474 U.S. 327, 332-33 (1986); Davis v. Scherer, 468 U.S. 183, 193-94 (1984).

IV.

We turn next to the question whether a pattern and practice of opening plaintiff's properly marked incoming court mail outside his presence, which infringes his rights to free speech and court access, rises to the level of a constitutional violation.

In several decisions the Supreme Court has struggled to define the standard for review of prison regulations which impinge upon the constitutional rights of inmates.  Though the Court announced a fairly searching standard in Procunier,[6] its later decisions in Turner and Abbott held that as to prison mail,

---

information in the hands of prison officials may result in ridicule, harassment, and retaliation.  If prisoners are stripped of the right to communicate privately their love, their hopes, and even their grievances, then recidivism rather than rehabilitation is fostered.  Similarly, opening legal mail outside the presence of an inmate, giving rise to the reasonable inference that such mail is read, may also implicate the right to privacy.  We do not reach this issue, however, as plaintiff has not placed it before us.

[6]In Procunier, the Court held that a prisoner's mail is protected "against unjustified governmental interference."  416 U.S. at 408-09.  To justify interference, the government must show an "important or substantial governmental interest unrelated to the suppression of expression," id. at 413, and that the suppression was "no greater than is necessary or essential to the protection of the particular governmental interest involved." Id.

the Procunier standard is "limited to regulations concerning outgoing correspondence." Abbott, 490 U.S. at 413 (emphasis added).

In Turner, the Court applied a less rigorous standard for review of incoming mail, a standard which it applied in Abbott as well. The Court in Turner held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. See also Shabazz, 482 U.S. at 349-50 (applying Turner reasonableness standard to regulations that restrict free exercise of inmate's religion). The Court then identified several factors useful in evaluating reasonableness. Id. at 89-91. See also Abbott, 490 U.S. at 414-18; Sturm v. Clark, 835 F.2d 1009, 1013-14 (3d Cir. 1987). The Abbott Court acknowledged that the Turner standard is more deferential to prison officials than that of Procunier, but embraced the new test with the caveat that "a reasonableness standard is not toothless." Abbott, 490 U.S. at 414. See also Turner, 482 U.S. at 97 (ban on inmate marriage not reasonably related to legitimate penological interests).

Though the case before us concerns an alleged pattern and practice of official conduct, rather than a prison regulation, application of the Turner standard is appropriate. See Brewer, 3 F.3d at 825-26 (applying Turner standard to prison practice, not regulation). We also note that the government does not argue that the conduct alleged by plaintiff comports with Turner.

The first Turner factor asks whether there is a rational connection between the infringing prison practice and a valid government interest. To justify interference with prisoner mail, officials typically invoke their interests in rehabilitation of inmates and institutional security. See, e.g., Abbott, 490 U.S. at 415; Shabazz, 482 U.S. at 348. First, in the absence of a determination by, for example, a prison psychiatrist that receipt of particular correspondence would disturb an inmate, we hesitate to conclude that the government interest in rehabilitation is served by opening incoming court mail outside an inmate's presence. See Ramos, 639 F.2d at 581-81. Second, the interest in institutional security is generally linked to mail on the supposition that correspondence may contain plans for escape or incite violence. We recognize the validity of this substantial interest, but to argue that it is served on the facts of this case--to suggest that repeatedly opening incoming court mail outside the presence of an inmate advances a legitimate interest in institutional security--would overreach.

In addition, we note that prison officials themselves have long recognized that providing a confidential, reliable means for prisoners to communicate their grievances to impartial courts and government officials, and to obtain a fair resolution of those grievances, releases tension in the prisons and itself advances the state interest in maintaining institutional order and security. See generally Ira P. Robbins, The Prisoners' Mail Box and the Evolution of Federal Inmate Rights, 144 F.R.D. 127 (1993) ("Prisoners' Mail Box"). In 1929, for example, Superintendent of

Prisons (and later first Director of the U.S. Bureau of Prisons) Sanford Bates wrote to the warden of the federal jail at Fort Leavenworth:

> It seems to me important that the inmates in your institution should have some reasonable and dignified method of making known any real or fancied grievance that they might have. An institution is a good deal like a steam boiler, and needs a safety valve occasionally.

Prisoners' Mail Box, 144 F.R.D. at 143. An understanding of the benefits of such a "safety-valve" persuaded prison officials that preserving the confidentiality of communications with courts, agencies, and legislators advanced, rather than frustrated, important penological interests. Id. at 148-49, 153-54.[7]

Consideration of the second Turner factor, the availability of alternate means of exercising the rights at issue, also indicates that defendants' practice is not reasonably related to a legitimate interest. Although other means of expression remain available to prisoners even when prison officials interfere with their general mail, Abbott, 490 U.S. at 417-18, we are not aware of means other than by way of uninhibited use of the mail for pro se prisoners to exercise their rights of court access.

Finally, the third Turner factor concerns the burdens of accommodating the exercise of prisoners' constitutional rights. To accommodate plaintiff's rights to free speech and court access

---

[7]Interestingly, though prison officials initially censored inmate correspondence to federal judges to ensure that the content was decent, respectful, and non-libelous, when federal judges and even the Clerk of the U.S. Supreme Court expressed a preference for receiving prisoner mail unopened and unexpurgated, the Bureau of Prisons changed its procedures. Prisoners' Mail Box, 144 F.R.D. at 155, 159-60.

by opening his incoming court mail only in his presence places no burden at all on guards, prisoners, and the allocation of prison resources: it is what the regulations have required since 1985. See 28 C.F.R. §540.18 (1994).

We hold that the pattern and practice of opening plaintiff's properly marked incoming court mail outside his presence fails the Turner reasonableness standard and violates the Constitution. We acknowledge that our conclusion differs from that of the Fifth Circuit, see Brewer, 3 F.3d at 825, but note that it comports with the results reached by the majority of courts of appeals to consider these precise or similar issues, not to mention the results reached by our own district courts. See Lavado, 992 F.2d at 609–10; Castillo, 990 F.2d at 307; Lemon, 931 F.2d at 1468; Washington, 782 F.2d at 1139; Jensen, 648 F.2d at 1182–83; Ramos, 639 F.2d at 582; Jordan, ___ F.Supp. at ___, 1995 WL 139274, at *4–5; Proudfoot, 803 F.Supp. at 1052; Carty, 440 F.Supp. at 1162–63.

As noted above, we are careful to distinguish between a single, inadvertent opening of properly marked legal mail outside an inmate's presence and a pattern or practice of such actions. The former may not infringe a prisoner's right to free speech, nor his right to court access absent a showing of actual injury. The latter, however, both infringes those rights and fails Turner.

V.

Even where a plaintiff can establish a constitutional violation, under the doctrine of qualified immunity government officials will not be liable if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In contrast, if "the law is not established clearly when an official acts, he is entitled to qualified immunity because he 'could not reasonably be expected to anticipate subsequent legal developments.'" In re City of Philadelphia, ___ F.3d at ___, 1995 WL 88161, at * 16 (quoting Harlow, 457 U.S. at 817–19). Though here again the question is close, we conclude that defendants are not entitled to qualified immunity.

There can be no dispute that the contours of plaintiff's rights under §540.18 and §13(a) of the Policy Statement were sufficiently clear that a reasonable prison official would understand that repeatedly opening plaintiff's incoming court mail outside his presence violates those regulations. Although promulgation of a regulation will not constitutionalize its violation, §540.18 and the Policy Statement surely undermine any claim by defendants that they were unaware of their legal obligations in handling plaintiff's mail. Thus the government's argument is reduced to the contention that while the illegality

of their behavior was manifest, the constitutional magnitude of their actions was murky.

We disagree. First, in Procunier and Wolff the Supreme Court made clear that the treatment of a prisoner's legal mail implicates constitutional rights to free speech and court access. The subsequent decisions in Turner and Abbott did not question that interference with prison mail infringed these constitutional rights; the latter decisions merely established that such infringement was constitutionally permissible if it was reasonably related to a legitimate penological purpose. Here, defendants do not even argue that their conduct meets this standard.

Second, though numerous other courts of appeals have considered conduct akin to that alleged by plaintiff, no gaping divide has emerged in the jurisprudence such that defendants could reasonably expect this circuit to rule other than we do. See Lavado, 992 F.2d at 609–10; Castillo, 990 F.2d at 307; Lemon, 931 F.2d at 1465; Washington, 782 F.2d at 1139; Ramos, 639 F.2d at 582; Jensen, 648 F.2d at 1182–83. Only the Fifth Circuit has reached a contrary decision. Brewer, 3 F.3d at 825; Walker, 4 F.3d at 413.

The Seventh Circuit's decision in Castillo is particularly instructive. There, a prisoner alleged that three letters from a federal courthouse were opened outside his presence. Because three instances "may be indicative of ongoing activity," 990 F.2d at 306, the Seventh Circuit determined that the inmate had "presented a colorable claim" of a constitutional violation and

reversed the district court's dismissal of the action. Id. at 307.

The Sixth Circuit's decision in Lavado is also relevant. There, the court denied summary judgment to defendant prison officials on the basis of qualified immunity where one letter from the Court of Appeals for the Eleventh Circuit was allegedly opened outside an inmate's presence and a second letter, from a state law department, was allegedly opened and read in his presence. Lavado, 992 F.2d at 609-10. The Sixth Circuit held that "it was clearly established at the time of the openings/reading in the instant case that prisoners' mail could not be opened or read in [an] arbitrary or capricious fashion." Id. at 610.

Third, the district courts in our circuit who have addressed the issue have consistently determined that repeatedly opening a prisoner's legal mail outside his presence violates the Constitution. See Jordan, ___ F.Supp. at ___, 1995 WL 139374, at *5; Proudfoot, 803 F.Supp. at 1052; Carty, 440 F.Supp. at 1162-63. See also Young v. Keohane, 809 F.Supp. 1185, 1197-98 (M.D.Pa. 1992) (denying qualified immunity to prison officials who allegedly intercepted mail addressed to judges and court personnel).

Finally, the absence of a previous decision from our court on the constitutionality of the conduct at issue is not dispositive. We have explained that the "clearly established" standard "require[s] 'some but not precise factual correspondence between relevant precedents and the conduct at issue.'" In re

City of Philadelphia, ___ F.3d at ___, 1995 WL 88161 at *25 (citation omitted). We think the facts of Castillo, Lavado, Proudfoot, and Carty enjoy a substantial "factual correspondence" to the circumstances here.

Thus, we conclude that though our court has not previously ruled on this precise issue, the contours of defendants' legal obligations under the regulations and Constitution were sufficiently clear that a reasonable prison official would understand that repeatedly opening plaintiff's properly marked incoming court mail outside his presence violates the Constitution. Accordingly, we will reverse the district court order granting defendants qualified immunity from plaintiff's claims.

                              VI.

For the foregoing reasons, we will affirm in part, see note 1, supra, and reverse in part the order of the district court granting summary judgment to all defendants on all claims.

Bieregu v. Reno, No. 94-5719


SCIRICA, Circuit Judge, concurring.



        I agree that Bieregu has alleged a constitutional
violation of his right to court access, and that the law was
sufficiently established to preclude a finding of qualified
immunity.  But I have doubts that Bieregu's free speech rights
are implicated here.

        First Amendment free speech rights are implicated when
prison officials censor inmates' mail.  Procunier v. Martinez,
416 U.S. 396, 409 (1974), overruled on other grounds, Thornburgh
v. Abbott, 490 U.S. 401 (1989).  But "freedom from censorship is
not equivalent to freedom from inspection or perusal."  Wolff v.
McDonnell, 418 U.S. 539, 576 (1974).  Because it is far from
clear that defendants censored Bieregu's court mail, I would base
this holding on his constitutional right to court access.

        Also, because Bieregu has not claimed his right to
privacy was infringed, it is unnecessary to address this issue.