**Seifuddin SIMPSON, Plaintiff,**

v.

**Martin HORN, et al., Defendants.**

No. CIV. A. 95–CV–8028.

United States District Court,
E.D. Pennsylvania.

Jan. 14, 2000.

Abraham C. Reich, Fox Rothschild, O'Brien & Frankel LLP, Philadelphia, PA, for Plaintiff.

Sue Ann Unger, Office of Attorney General, Philadelphia, PA, for Defendant.

## EXPLANATION AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Seifuddin M.A. Simpson ("Simpson") brought this § 1983 lawsuit against Pennsylvania Corrections Commissioner Martin Horn and several officials at SCI–Graterford ("SCIG" or "Graterford"),

alleging that the classification system for assigning cellmates violates the equal protection clause of the Fourteenth Amendment.[1] The history of this case is set out in my August 28, 1998 Memorandum and Order, in which I denied summary judgment on plaintiff's equal protection claim against defendants, SCI–Graterford Superintendent Donald Vaughn, and four other Graterford officials, Unit Managers William Conrad and Joseph Murphy and Lieutenants Rick Sundermier and William Mash. Plaintiff seeks compensatory and punitive damages as well as declaratory and injunctive relief. All defendants move for summary judgment. For the reasons set forth below, to the extent that plaintiff seeks injunctive relief, summary judgment will be granted on plaintiff's claim for injunctive relief. Summary judgment will otherwise be denied.

## I. Scope of Complaint

In his complaint, plaintiff states "that he has been made to feel that he cannot be placed in a cell with another inmate of another race because as an African American he will be considered a threat to any other inmate of another race." (Pl.Compl. ¶ 23). Defendants first contend that the complaint alleges racial discrimination on August 30, 1995, the date of plaintiff's cell assignment on D–Block, not during plaintiff's entire stay on D–Block. Defendants concede, however, that the Court may interpret plaintiff's complaint to include his entire stay on D–Block, from August 30, 1995 to September 6, 1996. I interpret plaintiff's complaint to encompass his entire stay on D–Block as plaintiff's complaint states that "there is continual discrimination because inmates are housed according to race." (Pl.Compl. ¶ 23).

Second, defendants argue that plaintiff's claim is limited to his stay on D–Block and therefore, plaintiff's experiences on the "new side"[2] and on B–Block, where plaintiff is currently housed, are irrelevant to plaintiff's claim. Plaintiff contends that his claim includes his entire incarceration at Graterford. After reviewing plaintiff's complaint and recognizing that plaintiff's complaint was drafted when plaintiff was proceeding *pro se*,[3] I interpret plaintiff's complaint to include his stay on the "new side." However, I do not construe plaintiff's complaint to include plaintiff's incarceration on B–Block, where plaintiff is currently housed, as no allegation of discrimination regarding this block exists.

To summarize, I find that plaintiff's complaint encompasses his stay on the "new side" and his entire incarceration on D–Block.

## II. Discussion

 To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, Simpson must show that: 1) defendants intentionally discriminated on the basis of race in making cell assignments; 2) plaintiff suffered a legally cognizable injury; and 3) defendants were personally involved in the alleged violation.

 Defendants contend that summary judgment should be granted in their favor. First, defendants have not racially discriminated in cell assignments, and therefore have not violated plaintiff's right to equal protection under the Fourteenth Amendment. Second, plaintiff has not alleged a cognizable injury. Third, defendants lack the requisite personal involvement to establish liability for an equal protection violation under § 1983. Further, defendants

---

1. Plaintiff also alleged that conditions of confinement violated his Eighth Amendment rights. In my August, 1998 order, I granted summary judgment in favor of all defendants on plaintiff's Eighth Amendment claims.

2. The "new side" refers to Lower H and I Blocks where "new receptions" are housed.

Plaintiff was housed on H–Block. (Defs. Motion Summ. J at 2, 5).

3. A *pro se* complaint should be construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). *See also, Lewis v. Attorney Gen. of the United States*, 878 F.2d 714, 722 (3d Cir.1989).

argue that plaintiff's claim for injunctive relief is moot and that defendants are entitled to qualified immunity from monetary damages. I will address each of these arguments in turn.

## A. *Racial Discrimination in Cell Assignments*

SCIG has a double-celling policy statement that lists compatibility factors to be considered in making celling assignments. Exhibit D–1, an Administrative Memorandum dated March 29, 1990, with the heading "Inmate Housing–Double Celling," lists "race and ethnic biases of the inmate" as one of the factors to be considered in making involuntary double-celling assignments. Exhibit D–4, a policy statement from the Pennsylvania Department of Corrections on single celling ("Z code") and double celling housing policy, dated December 23, 1996, adds the following proviso to the race and ethnic bias factor: "this factor shall not be interpreted to mean that only inmates of the same race should be celled together-rather its intent is to ensure that inmates who have exhibited documented history of interracial violence or a propensity to engage in such, should not be celled with a person upon whom they would be likely to act out."

■ In my August 28, 1998 opinion, I determined that the official policy in place at SCIG for classification of inmates for cell assignment meets the reasonableness standard set forth in *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). However, at that time I found that at issue was whether this stated policy was in fact the actual policy used by defendants in making cell assignments. To establish a violation of Equal Protection Clause of the Fourteenth Amendment, a plaintiff must

show that a defendant intended to racially discriminate. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). In my August 28, 1998 opinion, I concluded that three pieces of evidence were "some evidence of intent." Additionally, based on the record before me at the time, I could not determine whether plaintiff had adequately tied each defendant to the classification system allegedly used for making cell assignments to establish liability.

### 1. Whether defendants practice official DOC policy

Defendants assert that they practice the DOC's official double-celling policy. (Defs. Motion for Summ. J at 23). In support, defendants refer to the depositions of the four defendants responsible for giving inmates cell assignments. Defendants cite to the depositions of two of the four defendants, Lt. Sundermier[4] and Unit Manager Conrad in which they testified that they practice initial random "celling" subject to inmate requests for reassignment and DOC policy. Conrad explained that an inmate was assigned "randomly" and that race can be considered as a compatibility factor if evidence of racial bias exists. (Conrad Dep. at 11–12, 15). Defendants also point to the deposition of Lt. Mash who testified that he makes cell assignments in a similar manner subject to bias concerns. (Mash Dep. at 23–24). The fourth defendant, Unit Manager Murphy, indicated that he did not make random assignments, but explained how he applies official cell-assignment policy.[5]

---

**4.** In their motion, defendants refer to Sundermier's deposition in which he stated that he made cell assignments from the dining room area based on a list of available cells and that this list did not include the race of the inmate already assigned to those cells. (Sundermier Dep. at 30–32). He also stated that he does not look in the unit manager's office at the

chart board when making these assignments. (Sundermier Dep. at 36).

**5.** Defendants note that Murphy stated that racial bias is a compatibility factor used in cell assignments. (Murphy Dep. at 12, 45–46). Murphy stated that if choice existed in bed availability, he would ask inmates about

Plaintiff asserts that portions of defendants' deposition testimony show that defendants were not following the official prison double-celling policy. Plaintiff appears to contend that although racial or ethnic bias is a legitimate compatibility factor under the DOC policy, the depositions of two defendants indicate that they believe race itself is a factor in making cell assignments. Specifically, plaintiff cites the depositions of defendants, Murphy and Mash. In Murphy's deposition, he stated that race was a compatibility factor used when assigning cells. (Murphy Dep. at 45–46). Similarly, in Mash's deposition, Mash stated that race was one of the factors considered. (Mash Dep. at 11, 24–26).

Additionally, plaintiff points to two memoranda as evidence of unconstitutional racial classification. Plaintiff offers memoranda written by DOC employees as evidence of misinterpretation of compatibility factor (c), "Race and ethnic biases of the inmates to be housed together" existed during the period in which plaintiff was housed in D–Block. First, plaintiff offers a November, 1991 memo written by Deputy Commissioner Reid. Reid's memorandum states that "some institutions may be misinterpreting" the compatibility factor involving race. Reid explains that the factor should not be interpreted "to mean that only black inmates should be celled with blacks, or whites with whites" and states that the purpose of the factor was to ensure that inmates who have history of violence against other races or a propensity to act in this manner would not be housed placed with an inmate "whom they would likely act upon." Further, "[t]he race of an inmate ... as the sole factor ... shall not dictate cellmate assignment." Second, plaintiff points to a March, 1996 memorandum issued by Deputy Commissioner Clymer which similarly clarifies the use of the race and ethnic bias compatibility factor. Defendants suggest that these memoranda are not persuasive evidence that defendants were not practicing official DOC policy as neither document indicates which institutions were misinterpreting the race and ethnic bias factor.

Plaintiff also contends that Judge Shapiro's decision in *Abbott v. Smaller*, demonstrates that the official DOC double-celling policy was not being followed. In that case, Judge Shapiro held that an SCI–Graterford sergeant violated an inmate's right to Equal Protection by ordering him to change his cell solely because of his race. *See Abbott v. Smaller*, No. 88–2800, 1990 WL 131359 (E.D.Pa., Sept.5, 1990). The court found that defendant applied an "unwritten prison policy" that prevented different races from sharing a cell unless no other cell was available. *Id.* at *2. Defendants distinguish *Abbott* from this case, stating that *Abbott* involved a different defendant and, at that time, no explanation existed as to how the compatibility factors included in the DOC policy should be applied. Since 1990, however, the DOC cell-assignment policy has been clarified.

Because plaintiff has presented sufficient evidence that a factual question remains as to whether defendants practice the official DOC double-celling policy, I will evaluate whether plaintiff has presented evidence that defendants acted with discriminatory intent.

### 2. Evidence of Discriminatory Intent

To establish a claim for denial of equal protection, plaintiff must show purposeful discrimination by the defendant. *See Arlington Heights*, 429 U.S. at 265–66, 97 S.Ct. 555. In my August, 1998 opinion, I concluded that plaintiff had shown some evidence of discriminatory intent. The three pieces of evidence to which I referred were: 1) a statement allegedly made by a guard, C.O.I. Mason, when plaintiff arrived on the "new side;" 2) the

preferences and asserted that most housing assignments are made by inmate requests.

(Murphy Dep. at 25–26, 29–30).

D–Block chart board; and 3) the July 1996 memorandum written by former deputy Chwasciewski.

After reviewing defendants' motion for summary judgment and plaintiff's response, I conclude that plaintiff has presented evidence sufficient to establish a disputed issue of fact as to whether the defendants acted with discriminatory intent.

### a. Statement by guard on new side

Plaintiff testified that when he first arrived on the "new side" in July of 1995, he requested to be celled with a white inmate whom he knew from Delaware County Prison, and was told by an unnamed guard (who has since been identified as C.O.I. Mason) that "you know we don't play that up here anymore."

Defendants argue that this statement is not evidence of intentional discrimination by defendants. Defendants' argument is two-fold. First, they argue that plaintiff's statement that he was told "we don't play that up here anymore" is inadmissible hearsay. Second, even if the statement is admissible, it is irrelevant to plaintiff's claim because this statement was allegedly made on the "new side" in July, 1995 and does not involve any defendant in this case.

With respect to defendants' assertion that this statement is hearsay and inadmissible, defendants cite *Logan v. Davis*, 166 F.3d 1205, 1998 WL 744004 (3d Cir. 1998). (Defs. Motion for Summ. J at Ex. D–22). In *Logan*, a prisoner sued prison officials alleging numerous constitutional violations. One of these allegations was based on unsubstantiated statements made to him by a co-plaintiff. The Court held that these statements were insufficient to defeat a summary judgment motion. *Id.* at *5.

Even if the statement is admissible, defendants contend that this comment was made when plaintiff was on the "new side," a "time and place irrelevant to plaintiff's claim." Additionally, defendants offer evidence that a white cell "neighbor," the same individual that plaintiff claims to have requested as a cellmate, was housed with a Hispanic individual [6] at the time the comment was made. Because this adjacent cell was integrated, defendants contend that the comment could not have referred to race.

Because grounds for the admissibility of this statement may exist, I will consider the statement for purposes of this motion. Regarding defendants' assertion that this statement is irrelevant to plaintiff's case, as discussed above, I have interpreted the scope of plaintiff's complaint to include his experiences on the "new side," and thus this statement may be relevant to plaintiff's claim.

### b. D–Block Chart Board

During his stay on D–Block, plaintiff was celled first with inmate Miller, who is also African American, and then with plaintiff's cousin (at plaintiff's request), who is also African American. Plaintiff testified that there is a chart in the D–Block unit manager's office which identifies all the cells on D–Block as Black cells, Hispanic cells, or White cells. Defendants contend that the chart is not evidence of discriminatory intent.

Defendants assert that the chart's information about the racial makeup of the inmates serves statistical and reporting purposes. Additionally, when officers are not familiar with the assigned locations of all inmates, this information helps officers identify inmates. Information about race is a security tool to discourage inmates from switching cells for the night or "eluding detection for purposes of escape" and is also useful when an inmate is missing

---

**6.** In defendant's motion, the cellmate is described as "Hispanic, of medium complexion, with black hair." Attached to defendants' motion is a photograph of the individual. (Defs. Motion for Summ. J at Ex. D–8).

during a count. Conrad also testified that the count board is a tool for a unit manager or counselor to help an inmate who is unhappy with his cell assignment because of bias and racial or ethnic difference. Defendants also point out that when Unit Manager Conrad reviewed the D–Block chart board, in May, 1999, the chart showed that 22 of 201 cells used for double-celling were integrated. (Conrad Decl. ¶ 2 ). Additionally, photographs of the D–Block board taken in October, 1998 demonstrate that some cells are integrated.[7] Thus, defendants conclude that no evidence of discriminatory intent exists or can be reasonably inferred.

Plaintiff contends that the chart board is evidence that defendants used race-based considerations when making cell assignments. Plaintiff emphasizes that the board provides only information regarding an inmate's race, number, and if the inmate was "Z-coded." [8] Plaintiff notes that all defendants, except Vaughn, have admitted that assigning cells in D–Block was part of their duties in 1995. According to plaintiff, on August 30, 1995, one of the defendants (or someone under their authority) considered only plaintiff's race when assigning him a cell, not the compatibility factors set forth in the official DOC double-celling policy. In support of this assertion, plaintiff states that when plaintiff arrived on D–Block, he was housed with Guy Miller, an African–American inmate, who is a smoker, a "violent offender" and from a different area than plaintiff. (Simpson Dep. at 93). Defendants respond that the plaintiff and his cellmate shared the same religion, were both from

the Philadelphia five-county area, and neither inmate complained about a lack of compatibility. Additionally, defendants respond that no cell assignment policy prohibits housing violent offenders with other types of offenders.

Plaintiff also contends that evidence offered by defendants which shows that, in May, 1999, 22 of 201 cells used for double-celling were integrated is irrelevant because this lawsuit addresses an earlier time period.[9] With respect to the integration of cells in 1995, plaintiff testified that black and white inmates were not celled together, however, Hispanic inmates were integrated with other races. (Simpson Dep. at 212). Defendants contend that integrated cells did exist in 1995. Plaintiff argues that in light of the summary judgment standard, his statements regarding whether cells were integrated in 1995 should be given more weight than those of the defendants. Additionally, plaintiff argues that defendants' assertions are unsupported because the 1995 chart board no longer exists.[10]

### c. Chwasciewski memorandum

Attached to defendants' motion is a memorandum, dated July 1, 1996, from SCIG Deputy Superintendent Thomas Chwasciewski titled "Placement of Inmates upon Reception" states in part: "Effective immediately, the practice of placing inmates of the same race in the same cell will be modified. Inmates should be mixed racially (i.e., black/white, Hispanic with black/white). This is not to say that inmates who are friends or family of the same race cannot be placed together, it is

---

7. In October, 1998, photographs were taken of the chart board. At this time, 10 cells were integrated; meaning that 20 of 530 or 530 inmates were in integrated cells. (Conrad Decl. ¶ 1).

8. This coding means that an inmate required a single cell (a variety of factors may be the basis for this coding).

9. Note that defendants refer to this statement in their reply brief as evidence that plaintiff's

claim for injunctive relief is moot. (Def. Reply Brief at 11).

10. In defendants' Reply Brief, defendants challenge the "spoilation inference" made by the plaintiff. According to defendants, the chart board was changed daily and is not an example of a case in which a party destroys evidence when it becomes aware that it is relevant to litigation. (Def. Reply Brief at 3).

intended, however, to give you a tool when you receive inmates." (Defs. Motion for Summ. J. Ex. D–5). Defendant Vaughn denies that this memorandum shows that a practice of racial segregation existed before the issuance of the memo, but is rather a "poor attempt to respond to my I[sic] suspicion that I shared with the deputy that some staff were too easily assuming that inmates of the same race would prefer housing together in the new reception area, before inmates are classified, and thus before staff learns about many of the compatibility factors to be considered."

Defendants concede that this 1996 memorandum could be considered evidence of discriminatory intent by "someone against some newly received inmates," however, it is not evidence of discriminatory intent in this case. First, this memorandum applies to the "new side only" rather than to D–Block, where plaintiff was housed at the time relevant to this lawsuit. Defendants argue that because plaintiff was not on the "new side" at the time the memorandum was written, it is not relevant to plaintiff's claim. Even if the memorandum applied to plaintiff, the fact that none of the defendants were aware of or involved in race discrimination along with evidence that the cell adjacent to plaintiff's new side cell was integrated demonstrates that this memorandum is not evidence of discriminatory intent in this case.

Regarding defendants' assertion that this memorandum does not apply to plaintiff, although plaintiff was not housed on the "new side" at the time this memorandum was written, at least two considerations may weigh in favor of finding this memorandum relevant to plaintiff's claim. First, the document was issued only one year after plaintiff was housed on the "new side;" plaintiff was housed on the "new side" in July, 1995 and the memorandum was written in July, 1996. Second, the memorandum was written in response to Vaughn's concern that staff on the "new side" were assuming that inmates of the same race preferred to be housed togeth-

er. Arguably, the "new side" staff may have misinterpreted DOC policy up until the date of the memorandum, when plaintiff was housed there.

Plaintiff asserts that this memorandum is evidence of unconstitutional race-based classification. Plaintiff contends that it is not clear whether this memorandum applied only to the "new side" or to the prison, in general. The heading of the document is "Placement of Inmates Upon Reception." Although plaintiff does not develop this argument, it appears that plaintiff is contending that the memorandum may refer to new receptions on any block of the prison, not only on the "new side." Defendants offer evidence that the memorandum only applied to the "new side" and state that a trial cannot clarify the author's intent because Chwasciewski is deceased. However, as discussed above, I have determined that the memorandum may be relevant to plaintiff's claim, and thus it is not necessary for me to address whether this document applies to the entire prison or only to the "new side."

After reviewing the evidence on the record discussed above, I conclude that viewed in a light most favorable to the plaintiff, plaintiff has produced sufficient evidence in support of his equal protection claim to allow the claim to survive summary judgment.

### B. Cognizable injury

■ Defendants argue that plaintiff fails to allege a cognizable injury because the cell assignments were not based on race except in accordance with the official DOC policy and plaintiff chose to cell with his cousin even though Unit Manager Conrad offered to help him switch cellmates in March, 1996.

Plaintiff challenges defendants' assertion that plaintiff has not suffered cognizable injury. Plaintiff claims that he has suffered mental distress as a result of defendants' actions as well as harassment because he filed this suit. Additionally,

plaintiff alleges that defendant Sundermier instructed other guards to harass plaintiff.

Plaintiff has set forth sufficient allegations to establish a legally cognizable injury as he alleges that the constitutional violation was the cause of plaintiff's injury.

### C. *Defendants' Requisite Personal Involvement*

■ In my August 28, 1998 order, I stated that the record was not sufficiently developed to allow me to determine whether plaintiff had shown the type of involvement by defendants required to establish liability. To bring a successful claim under § 1983 for denial of equal protection, a plaintiff must show that the defendants were personally involved in a deprivation of plaintiff's rights. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1293–94 (3d Cir.1997). Plaintiff can show requisite personal involvement in one of two ways: 1) that the defendant personally participated in the violation; or 2) that the defendant had actual knowledge of and acquiesced in the alleged violation. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988); *see also Robinson*, 120 F.3d at 1293–94.

#### 1. Personal Participation

■ Defendants first argue that plaintiff has failed to show that any of the defendants personally participated in the August 30, 1995 cell assignment. Defendants contend that plaintiff cannot show which, if any, of the defendants assigned him a cell on August 30, 1995. In their motion, defendants contend that none of the defendants recall how plaintiff received his cell assignment. With respect to defendant Sundermier, defendants contend that he was not involved in plaintiff's cell assignment because the log book indicates that plaintiff was assigned a cell between 2 p.m. and 10 p.m. and Sundermier worked the 6 a.m. to 2 p.m. shift.[11] Therefore, according to defendants' motion, three of the defendants could have given plaintiff his cell assignment, Lt. Mash, Unit Manager Murphy, or Unit Manager Conrad. Defendants state that evidence exists that a non-defendant may have made the cell assignment. Furthermore, plaintiff states that he received his cell assignment from an inmate clerk. Additionally, defendants assert that this information is a result of extensive discovery; no more evidence can be expected by plaintiff at trial.

As stated above, I have interpreted the scope of plaintiff's complaint to include plaintiff's entire stay on D–Block, rather than limited to plaintiff's cell assignment on August 30, 1995. As to these four defendants, a question of material fact exists as to the personal participation of all defendants either in the cell assignment on August 30, 1995 or in subsequent cell assignments affecting Simpson on D–Block.[12]

#### 2. Knowledge and Acquiescence

If a plaintiff cannot show that any of the defendants personally made the challenged cell assignment or directed others to make the assignment, plaintiff must prove actual knowledge of and acquiescence in the vio-

---

11. In his motion, plaintiff states that he arrived in the morning. However, in their reply, defendants state that plaintiff actually said that he "assumes that he arrived in the morning." (Pl.Resp.Ex. D). The logbook shows that plaintiff arrived in the afternoon. (Defs. Motion Ex. D7). Thus, defendants argue that there is no issue of material fact as to whether Sundermier was involved in giving plaintiff his cell assignment on August 30, 1995. I agree with the defendants that no evidence exists which shows Sundermier assigned plaintiff to a cell on that date.

12. As defendants state in their motion, the logbook indicates that plaintiff did not arrive during Sundermier's shift, and therefore Sundermier could not have made plaintiff's cell assignment on August 30, 1995. However, Sundermier worked on D–Block from October, 1995 until September 6, 1996; Simpson was housed on D–Block during that period. (Sundermier Decl. at 2). Since I have interpreted the complaint to include plaintiff's entire stay at D–Block, Sundermier could have made cell assignments that affected Simpson.

lation to establish liability. *See Rode*, 845 F.2d at 1207.

■ Regarding Supt. Vaughn, defendants assert that Vaughn did not know about plaintiff's cell assignment complaint until plaintiff's lawsuit. Defendant Vaughn stated in his declaration that he was not aware of plaintiff's request to be celled with an inmate of a different race, and that after he learned of plaintiff's complaint, he discussed the matter with the unit managers and "learned that the blocks did have some inmates of different races sharing cells, but that the great majority of inmates in the blocks that have less transient inmates tend to choose to cell with inmates of similar race, ethnicity and age. The concept of choice is assumed, since inmates could switch cells, usually by mere joint request." Knowledge of plaintiff's complaint cannot be inferred given the prison's policy of accepting inmate cell requests and the fact that some cells were integrated. Defendants argue that a single incident involving a sergeant's misunderstanding of DOC celling policy in *Abbott* does not create an issue of fact that Vaughn knew or did not know of the alleged equal protection violation over seven years later.

Plaintiff argues that *Abbott* indicates that Vaughn knew of racial discrimination at Graterford because Vaughn testified at that trial. Despite his knowledge, Vaughn has failed to prevent the use of race as factor in assigning cells. For example, Vaughn has continued to allow the use of the D–Block chart board.

Plaintiff has presented sufficient evidence to create an issue of material fact as to whether Vaughn had actual knowledge of or acquiesced in the alleged violation.

■ Plaintiff also argues that Unit Managers Murphy and Conrad may be liable because corrections officers used the D–Block chart board under their supervision. Although this argument is not developed by plaintiff, it appears he is arguing that Murphy and Conrad had actual knowledge of and acquiesced in the alleged violation. The depositions of both Unit Manager Murphy and Unit Manager Conrad indicate that they had overall responsibility for the block and that the chart board was used to assign inmates. (Murphy Dep. at 6, 14; Conrad Dep. at 10, 13). A question of material fact exists as to the knowledge and acquiescence of Murphy and Conrad.

### D. Injunctive Relief Claim

■ Defendants argue plaintiff's claim for injunctive relief is moot. First, with respect to his claim alleging racially discriminatory cell assignments on D–Block, plaintiff has acknowledged that he will not return to D–Block. Second, regarding cell assignments on the new side, plaintiff will not return to the new side unless there is a new conviction or new parole violation.[13] In his response, plaintiff did not address this argument.

In defendants' reply to plaintiff's motion, defendants further contend that plaintiff has withdrawn his claim for injunctive relief by stating on page 11 of his motion that "the current state of integration and condition of the chart board currently in use is irrelevant to the matter."

I will grant defendants' motion for summary judgment on plaintiff's injunctive relief claim. Plaintiff has not responded to defendants' argument.[14] To the extent

13. In support of this assertion, defendants cite *Abdul–Akbar v. Watson*, 4 F.3d 195 (3d Cir.1993). *Abdul–Akbar* involved a prisoner who sued prison officials, claiming that his constitutional right to access to the courts was violated by the inadequate library and legal resources available to him. On appeal, the Third Circuit vacated the district court's injunctive order because it found that the

claim was moot; Abdul–Akbar had been released from jail over eight months before the district court's decision. *See id.* at 206–07.

14. Additionally, plaintiff does not include this relief in its pretrial memorandum. Although the pretrial memorandum is not part of the motion before me, this omission supports the

that plaintiff has requested injunctive relief, plaintiff has not demonstrated that this remedy is justified or appropriate.

## E. *Qualified Immunity*

■■■■ Defendants argue that summary judgment should be granted based on their right to qualified immunity from monetary damages. "As government officials engaged in discretionary functions, [d]efendants are qualifiedly immune from suits brought against them for damages under section 1983, 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Sherwood v. Mulvihill,* 113 F.3d 396, 398–99 (3d Cir.1997) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Thus, *Harlow* provides the court with an objective standard against which to measure the official's actions. When applying this objective standard, the court must resolve two issues: (1) Has the plaintiff stated a violation of a constitutional or federal statutory right? *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); and (2) If so, was that right clearly established, i.e., were the "contours of the right … sufficiently clear that a reasonable official would understand that what [he or she] is doing violates that right"? *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

As I stated in my 1998 opinion, prohibition on racial segregation in cell assignments is a clearly established right of which a reasonable prison official would be aware, and thus did not give rise to qualified immunity. In renewing their claim, defendants argue that it was objectively reasonable for them to believe that their conduct did not violate plaintiff's rights. Defendants refer to *Miller v. Horn, et al.,* 96–CV–0248, in which plaintiff's cellmate raised the same equal protection claim against the same defendants involved in this case. Following a bench trial, Judge

conclusion that plaintiff is no longer pursuing

Fullam found in favor of the defendants. Defendants argue that the *Miller* decision demonstrates that defendants reasonably believed that their actions did not violate an inmate's rights.

Defendants have presented evidence that plaintiff Miller raised the same claims against the same defendants involved in this case. Defendants provide declarations of Vaughn and Conrad stating that the focus of the trial was the equal protection issue and whether there was an intent to discriminate by cell assignments. However, defendants do not point to a trial transcript or written opinion that indicates the basis for the ruling in favor of defendants. Therefore, I am unable to determine on the evidence before me whether *Miller* provides a basis for defendants' reasonable belief that they did not violate plaintiff's right to equal protection.

## III. Conclusion

For the reasons set forth above, I will grant defendants' motion regarding plaintiff's claim for injunctive relief. I will deny the remainder of defendants' motion for summary judgment.

**AND NOW,** this 13th day of January 2000, it is **ORDERED** that Defendants' Motion for Summary Judgment (docket entry 93) is granted in part and denied in part.

1. Defendants' motion regarding plaintiff's claim for injunctive relief is **GRANTED.**

2. Defendants' motion as to all remaining claims is **DENIED.**